709 P.2d 884

**STATE of Arizona, Appellee,**

v.

**Cecil Thurman KINKADE, Appellant.**

No. 5752–2.

Supreme Court of Arizona,
En Banc.

Nov. 18, 1985.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Jack Roberts, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by Edward McGee, Deputy Public Defender, Phoenix, for appellant.

HAYS, Justice.

Following a joint trial, defendant Cecil Thurman "Jim" Kinkade and codefendant Thomas Pearson were each convicted of one count of first-degree murder, A.R.S. §§ 13–1105, 13–1101, and one count of armed robbery, A.R.S. §§ 13–1904, 13–1901 and 13–1902. On appeal, this court, 140 Ariz. 91, 680 P.2d 801, held that it was reversible error to grant the state's motion for consolidation. We therefore reversed the convictions and sentences and remanded the matter for new and separate trials. After this second trial, defendant was again convicted of first-degree murder and armed robbery. He was sentenced to life without possibility of parole for twenty-five years for the murder, A.R.S. § 13–703, and to a concurrent sentence of ten and one-half years for the armed robbery, A.R.S. §§ 13–701, 13–604 and 13–702. It is from these second convictions that defendant now appeals. We have jurisdiction pursuant to A.R.S. §§ 13–4031 and –4035. We affirm.

The facts follow. Near the end of March 1982, defendant and the victim, Jacob Goldberg, were playing poker at the victim's apartment. While several people were in the apartment that night, only defendant and Goldberg were actually playing poker. By the end of the evening, defendant had lost approximately $10,000. Although defendant told a police detective that the debt had been forgiven, witnesses to the game stated that an arrangement was agreed upon whereby defendant would repay the debt at the rate of $200 per week.

Approximately one week later, on April 1, 1982, defendant was again at the victim's apartment. The defendant and the victim later left with Thomas Pearson and went driving in the victim's gold, 1979 Trans-Am. Sometime during the evening, the three men stopped at a Circle K in northeast Phoenix. According to Pearson, defendant attempted to hand him a .22-caliber pistol while the victim was inside purchasing beer. When Pearson refused to take the gun, defendant placed it next to the console in the car. The three men left the Circle K, with the victim driving. After a while, Pearson persuaded the victim to stop the car in a deserted area off Pinnacle Peak Road so he could vomit. According to Pearson's testimony, after the victim had stopped the car, defendant shot him three times in the back of the head with the pistol. Defendant then pulled the victim out of the car and shot him again in the head, stating, "so you like to gamble, huh, fucker." Defendant obtained the victim's briefcase and removed both the title to the car and the paper representing the $10,000 debt. He and Pearson then left the body and returned to defendant's parents' home to get a pick-up truck. Thereafter, they returned to where they had left the victim's body and loaded it into the truck. They then drove farther into the desert where they buried the victim in a shallow grave. Pearson claimed that he did not report the crime because defendant threatened to kill him if he did. The next morning, defendant and Pearson drove to Texas in the victim's car.

Upon arriving in Texas, defendant contacted Richard Berry, one of the state's witnesses. Berry testified that defendant had him sell the victim's Trans-Am and then turn the $5,000 sale proceeds over to him. Pearson and Berry returned to Phoenix and defendant flew back shortly thereafter.

While in Phoenix, Berry drove out to the desert with defendant and Pearson. According to Berry, defendant stated that they were going to check on a body. The defendant told Berry what had happened the night of the murder and, in so doing, admitted shooting the victim. Berry was subsequently able to direct police to the gravesite.

Additional testimony revealed that, around this same time, defendant sold

the .22-caliber pistol and attempted to dispose of the victim's briefcase. Defendant was subsequently arrested.

Defendant raises two issues.

## INSTRUCTION ON LESSER–INCLUDED OFFENSE

Defendant argues that the trial court erred by not giving his requested jury instruction on theft as a lesser-included offense of the armed robbery charge. He claims that since there was "a significant quantum of evidence supporting [defendant's] view of the facts," it was reversible error not to give an instruction on theft. We do not agree.

■ Rule 23.3, Arizona Rules of Criminal Procedure, 17 A.R.S., requires the court to instruct the jury on a lesser-included offense. In determining whether an instruction on a lesser-included offense is proper under Rule 23.3, this court set forth a two-part test in *State v. Celaya*, 135 Ariz. 248, 660 P.2d 849 (1983). The two elements of the test are: (1) whether the offense is a lesser-included offense of the crime charged, and (2) whether the evidence otherwise supports the giving of the instruction. *State v. Celaya*, 135 Ariz. at 251, 660 P.2d at 852.

■ The first question we must then consider is whether the crime of theft is a lesser-included offense of armed robbery. "To constitute a lesser-included offense, the offense must be composed solely of some, but not all, of the elements of the greater crime so that it is impossible to have committed the crime charged without having committed the lesser one." *State v. Celaya*, 135 Ariz. at 251, 660 P.2d at 852. This court has already determined that theft, as defined in A.R.S. § 13–1802(A)(1), is a lesser-included offense of robbery, A.R.S. § 13–1902, because robbery cannot be committed without committing the crime of theft. *State v. McNair*, 141 Ariz. 475, 482, 687 P.2d 1230, 1237 (1984); *State v. Celaya*, 135 Ariz. at 252, 660 P.2d at 853. Since armed robbery, by definition, neces-

sarily includes the crime of robbery, we find that theft *a fortiori* is also a lesser-included offense of armed robbery.

■ Second, we consider whether the evidence presented at trial supports the giving of a theft instruction. In doing so, we must determine whether the jury could rationally find that the state failed to prove an element of the greater offense. *State v. Celaya*, 135 Ariz. at 252, 660 P.2d at 853. If the jury could rationally find that the state failed to prove that the taking of the victim's car and property was accomplished by force, but did in fact prove all the other elements, the jury could return a guilty verdict for theft. *Id.; State v. Mitchell*, 138 Ariz. 478, 480, 675 P.2d 738, 740 (App. 1983).

In the instant case, defendant and the state presented two conflicting versions of the shooting. Although defendant did not testify, his story was related to the jury through a police detective. According to defendant, he and the victim got into an argument while the three men were driving around. The victim stopped the vehicle and the two men got out and began to fight. When the victim attempted to strike defendant with a stick, Pearson suddenly shot him three times in the back of the head. Defendant and Pearson then buried the body in the desert and returned to Phoenix. Except for this testimony, the defense offered virtually no other evidence to corroborate defendant's story.

On the other hand, the state offered overwhelming evidence. In support of its theory, the state presented the testimony of Richard Berry. Berry stated that defendant admitted that he had shot the victim three times with a .22-caliber pistol and then buried the body in the desert. Berry also testified, as did his mother, that defendant and Pearson arrived in McAllen, Texas, on April 3 in a gold, 1979 Trans-Am. When asked where the car came from, defendant explained that "some guy" owed him $10,000 and the car was merely a trade-off.

Additionally, the state produced several women who were either acquaintances or

former girlfriends of defendant. The testimony of each was substantially identical to the other and indicated that defendant planned to rob and kill the victim over a gambling debt. Specifically, each of these women testified that defendant admitted he had killed a man for money.

Finally, the state introduced the testimony of Greg Hansen, a friend of defendant for several years. Hansen testified that defendant and Pearson stayed at his home for several days following the date of the murder. While there, defendant told him that he had killed a man to whom he owed $10,000. Hansen stated that defendant also promised to "take care of" anyone who turned him in. When Hansen asked Pearson about defendant's story, Pearson told him it was true. Thus, all the testimony presented at trial by the state clearly supports a finding that defendant intended to take the victim's car and property by the use of force.

■ A defendant is entitled to a lesser-included offense instruction on any theory of the case reasonably supported by the evidence. *State v. Lucas*, 146 Ariz. 597, 708 P.2d 81 (1985). In the instant case, defendant seems to be arguing that the victim's car and property were spontaneously taken only after the victim was murdered. However, defendant's statement, as related through the detective, was uncorroborated and inconsistent with prior statements he had given to the police. Furthermore, the defendant's version of the facts was contradicted by overwhelming evidence from the state. Specifically, the testimony of Richard Berry and several other witnesses confirmed the state's theory that defendant shot and killed the victim for pecuniary gain. Thus, based on the evidence adduced at trial, we do not believe a rational jury would have convicted defendant of the lesser-included offense of theft. We therefore find that the trial court properly refused defendant's requested instruction.

## POLYGRAPH EXAMINATION

During the trial, defense counsel requested that Thomas Pearson be required to submit to a polygraph examination pursuant to Rule 15.2(a) of the Arizona Rules of Criminal Procedure, 17 A.R.S. In making this request, defense counsel acknowledged the inadmissibility of polygraph evidence. Nevertheless, he urged the court to grant his request so that the results would be available as a tool for preparing his cross-examination of Pearson. Counsel argued that the use of polygraph results in this manner was merely a pretrial investigative technique comparable to voiceprinting, which is specifically provided for in Rule 15.2. Since the prosecutor is afforded this type of discovery, counsel claims that ordinary principles of fair play and equal justice require a reciprocal right on the defendant's behalf to use such nonadmissible investigative techniques. We find no merit in this argument.

Rule 15.2(a) provides, in part, that a criminal defendant must submit to various tests upon the request of the prosecutor. Among these tests are that defendant be fingerprinted, palmprinted, footprinted, or voiceprinted. *See* Rule 15.2(a)(3). The purpose of Rule 15.2(a) is to afford the prosecution a procedure for pretrial discovery. *State v. Tamplin*, 126 Ariz. 175, 177, 613 P.2d 839, 841 (App.1980). More specifically, such tests as fingerprinting, footprinting, palmprinting, and voiceprinting are available to help establish the identity of a defendant. 29 Am.Jur.2d, *Evidence* §§ 770, 832 (1967). On the other hand, the purpose of a polygraph examination is to test the veracity or credibility of the subject. *State v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (1962).

■ In the instant case, defense counsel was not attempting to use the polygraph examination to establish the identity of the witness. Rather, he intended to evaluate the strengths and weaknesses in Pearson's testimony in order to know on which areas to focus his cross-examination. Thus, counsel's analogy of a polygraph examination to those discovery techniques contained in Rule 15.2(a) is clearly inapposite.

Furthermore, there is no reason for defendant's proposed use of the polygraph examination. As the state correctly pointed out, defense counsel was an experienced trial attorney and had sufficient material with which to prepare his cross-examination of Pearson. As this was a retrial, counsel had all of Pearson's prior testimony available for impeachment purposes. Additionally, the trial court had ordered a deposition of Pearson, which was also available to counsel for preparation of cross-examination. Finally, as defendant was seated next to counsel throughout the trial, defendant could easily have alerted counsel if he felt that Pearson was lying. Thus, we fail to see how the trial court's denial of defendant's request to submit Pearson to a polygraph examination prejudiced defendant in any respect. We therefore find the action of the trial court proper.

We have reviewed the record for fundamental error and have found none. A.R.S. § 13–4035; *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

The judgment and sentences are affirmed.

HOLOHAN, C.J., GORDON, Vice C.J., and CAMERON and FELDMAN, JJ., concur.