999 P.2d 795

STATE of Arizona, Appellee,

v.

Ernesto Salgado MARTINEZ, Appellant.

No. CR–98–0393–AP.

Supreme Court of Arizona,
En Banc.

May 11, 2000.

Janet A. Napolitano, Attorney General By Paul J. McMurdie, Chief Counsel, Criminal Appeals Section and Jack Roberts, Assistant Attorney General, Phoenix, Attorneys for the State of Arizona.

Dean W. Trebesch, Maricopa County Public Defender By Lawrence S. Matthew and Louise Stark, Maricopa County Deputy Public Defenders, Phoenix, Attorneys for Ernesto Salgado Martinez.

## O P I N I O N

MARTONE, Justice.

¶ 1 Ernesto Salgado Martinez was convicted of first degree murder, other offenses, and sentenced to death. This is his automatic and direct appeal under Rule 31.2(b), Ariz. R.Crim. P. and A.R.S. § 13–4031. We affirm.

### I. BACKGROUND

¶ 2 Martinez drove from California to Globe, Arizona in a stolen blue Monte Carlo to visit friends and family. After learning that his parents had moved to Payson, Arizona, Martinez met his friend Oscar Fryer. Fryer asked Martinez where he had been. Martinez told Fryer that he had been in California. Fryer then asked Martinez if he was still on probation. Martinez responded that he was on probation for eight years and had a warrant out for his arrest. Martinez then pulled a .38 caliber handgun with black tape on the handle from under his shirt and showed it to Fryer. Fryer asked Martinez why he had the gun, to which Martinez responded, "[f]or protection and if shit happens." Tr. Sept. 9, 1997 at 83. Fryer then asked Martinez what he would do if he was stopped by the police. Martinez told Fryer, "he wasn't going back to jail." *Id.* at 85.

¶ 3 Sometime after his conversation with Fryer, Martinez left Globe and drove to Payson. On August 15, 1995, at approximately 11:30 a.m., Martinez was seen at a Circle K in Payson. He bought ten dollars worth of gas and proceeded south down the Beeline Highway toward Phoenix. Martinez was driving extremely fast and passed several motorists, including a car driven by Steve and Susan Ball. Officer Martin was patrolling the Beeline Highway that morning and pulled Martinez over at Milepost 195. Steve and Susan Ball saw Officer Martin's patrol car stopped behind Martinez' Monte Carlo and commented, "Oh, good, he got the speeding ticket." Tr. Sept. 10, 1997 at 32. As they passed by, Susan Ball noticed Officer Martin standing at the driver's side door of

the Monte Carlo while Martinez looked in the backseat.

¶ 4  Shortly after Steve and Susan Ball passed, Martinez shot Officer Martin four times with the .38 caliber handgun.  One shot entered the back of Officer Martin's right hand and left through his palm.  Another shot passed through Officer Martin's neck near his collar bone.  A third shot entered Officer Martin's back, proceeded through his kidney, through the right lobe of his liver, through his diaphragm, and lodged in his back.  A fourth shot entered his right cheek, passed through his skull, and was recovered inside Officer Martin's head.  The hand and neck wounds were not fatal.  The back and head wounds were.

¶ 5  After murdering Officer Martin, Martinez took Officer Martin's .9mm Sig Sauer service weapon and continued down the Beeline Highway at speeds over 100 mph.  Martinez again passed Steve and Susan Ball, which they found strange.  They began discussing how not enough time had passed for Martinez to have received a speeding ticket because it had only been a couple of minutes since they had seen him pulled over.  They stayed behind Martinez for some time and watched him go through a red light at the Fort McDowell turnoff.  Steve Ball commented, "Yeah, he just ran that red light.  Something is up here.  Something is going on."  Tr. Sept. 10, 1997 at 69.  Steve and Susan Ball continued down the Beeline Highway and lost sight of Martinez until they reached Gilbert Road. At the red light on Gilbert Road, they caught up to him and took down his license plate.

¶ 6  Martinez passed through Phoenix and arrived in Blythe, California at around 4:00 p.m. where he called his aunt for money.  At 6:00 p.m., Martinez called his aunt again because she failed to wire the money he requested.  Growing impatient, at approximately 8:00 p.m., Martinez entered a Mini-Mart in Blythe and, at gunpoint, stole all of the $10 and $20 bills from the register.  Martinez killed the clerk with a single shot during the robbery.[1]  A .9mm shell casing was recovered at the Mini-Mart the following day.  Ballistics reports determined that this shell casing was consistent with the ammunition used in Officer Martin's .9mm Sig Sauer.

¶ 7  Later that night, Martinez drove to his cousin's house in Coachella, California, near Indio.  Around 12:00 p.m. the next day, August 16, 1995, Martinez took David Martinez, his cousin, and Anna Martinez, David's wife, to a restaurant in Indio.  After leaving the restaurant, Martinez noticed that a police car was following him.  David asked Martinez if the car was stolen to which Martinez responded, "I think so."  Tr. Sept. 15, 1997 at 146–47.  Martinez turned onto a dirt road and instructed David and Anna to get out of the car.  They left the car and went to a nearby trailer compound to call Anna's aunt to come and get them.

¶ 8  Tommy Acuna,[2] who lived in his grandmother's house at the compound, was swimming when David and Anna appeared at the fence surrounding the compound.  David and Anna asked Tommy if they could use his phone but Tommy refused.  Tommy did permit Anna to use the bathroom.  Anna went into the bathroom and came out a couple of minutes later.  After showing David and Anna out, Tommy went back to the bathroom "to see if they left anything in there because she wasn't in there that long."  Tr. Sept. 16, 1997 at 48.  He found a towel on the floor with the .38 caliber handgun wrapped inside.  Tommy took the gun, hid it in his pants, and walked outside.  He testified that he hid the gun because it was his grandmother's house.  By the time Tommy walked outside, the police had surrounded the compound.  An officer monitoring the perimeter called out to Tommy and told him that he was going to search him.  Tommy walked over to the officer and exclaimed, "I have got the murder weapon."  Tr. Sept. 15, 1997 at 192.  The officer searched Tommy and found the .38 caliber handgun.  This gun was later identified as the weapon that fired the bullets which killed Officer Martin.

¶ 9  After David and Anna got out of the Monte Carlo, Martinez turned around on the

---

1.  The trial court excluded evidence of the murder under Rule 403, Ariz. R. Evid.

2.  Tommy's brother Johnny Acuna was a friend of Martinez.

dirt road. Another police car appeared on the scene and headed towards Martinez. Martinez saw this second police car, left the Monte Carlo, ran toward the trailer compound, and jumped the fence. He then ran into Johnny Acuna's trailer.

¶ 10 The SWAT team evacuated the area and tried to communicate with Martinez. After those attempts failed, the SWAT team negotiator threatened to use tear gas. Martinez responded, "I am not coming out; you will have to come in and shoot me." Tr. Sept. 17, 1999 at 23. After further negotiations, however, Martinez agreed to come out and was taken into custody.

¶ 11 While in custody, Martinez called his friend, Eric Moreno, and laughingly told Moreno that "he got busted for blasting a jura."[3] Tr. Sept. 15, 1997 at 13. Martinez also told Moreno that a woman on the highway might have seen what had happened. They talked about the guns and Martinez told Moreno that one of the guns had been "stashed." *Id.* at 21. After obtaining a warrant, the police searched Johnny Acuna's trailer and found Officer Martin's .9mm Sig Sauer under a mattress.

¶ 12 A jury convicted Martinez of first degree murder, a class 1 dangerous felony; theft, a class 6 felony; theft, a class 5 felony; misconduct involving weapons (prohibited possessor), a class 4 felony; and misconduct involving weapons (serial number defaced), a class 6 felony. The trial court sentenced Martinez to death for the murder conviction, and to terms of imprisonment for the noncapital crimes.

## II. ISSUES

Martinez raises the following issues on appeal:

### A. *Trial Issues*

1. Did the trial court err when it denied Martinez' *Batson* objection to the removal of venireperson Eric Veitch?

2. Did the removal of Eric Veitch violate article 2, section 12 of the Arizona Constitution?

3. Did the trial court err when it denied Martinez' *Batson* objection to the removal of venireperson Linda Preston?

4. Did the trial court abuse its discretion when it refused to strike venireperson Gail Schroeder for cause?

5. Did the trial court abuse its discretion when it admitted other acts into evidence?

6. Did the trial court abuse its discretion when it refused to instruct the jury on the defense of non-presence?

7. Did the trial court err when it deleted part of Martinez' proposed second degree murder instruction?

### B. *Sentencing Issues*

1. *Aggravating Factors*

a. Did the trial court improperly include Martinez' 1996 Dangerous or Deadly Assault by a Prisoner convictions under A.R.S. § 13–703(F)(2)?

2. *Mitigating Factors*

a. Did the trial court err when it found that Martinez failed to prove his ability to conform his conduct to the requirements of law was significantly impaired pursuant to A.R.S. § 13–703(G)(1)?

b. Did the trial court fail to give sufficient weight to the non-statutory mitigating factors?

## III. ANALYSIS

### A. *Trial Issues*

1. *Batson objection to venireperson Eric Veitch*

¶ 13 The State used one of its peremptory strikes to remove Eric Veitch, a black man, from the jury. Martinez challenged this strike under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The trial court determined that, because Mr. Veitch was in the class protected by *Batson,* the State had the burden of demonstrating a race-neutral reason for the strike. The State explained:

---

**3.** "Jura" is slang for police officer. Tr. Sept. 15, 1997 at 13.

Mr. Veitch is, of course, a pastor. He's strongly opposed to the death penalty. This is, in and of itself, I believe, a racially neutral reason for the strike.

He also, I might add, had a conversation with the girlfriend of the defendant, as did some other jurors. And although he may not have known or claims to have not known at the time that this was the girlfriend of the defendant, he did have an extensive conversation with her and counseled her and must have known during the jury selection process that this is inappropriate to be speaking to people in the hallway.

Tr. Sept. 8, 1997 at 163–64. The trial court found that the State's explanation was sufficiently race-neutral and denied Martinez' *Batson* challenge.

¶ 14  On appeal, Martinez now argues that the State improperly struck Mr. Veitch because of his religious affiliation. Martinez alleges that the State struck Mr. Veitch because "he is a pastor, and pastors are forgiving." *Id.* at 165. Martinez asks us to extend *Batson* to peremptory strikes based on religion.

¶ 15  We need not reach this issue because Martinez failed to show that the State struck Mr. Veitch based on his religious affiliation. The State did not strike Mr. Veitch because he was Christian. Rather, the State struck Mr. Veitch because of his occupation as a pastor and because "[h]e's strongly opposed to the death penalty," and may have "had a conversation with the girlfriend of the defendant." *Id.* at 163–64. Had Mr. Veitch been a social worker and had the State struck Mr. Veitch because social workers are forgiving, there would have been no question about the validity of the strike.

¶ 16  Martinez alternatively argues that even if *Batson* does not extend to religion, the State violated *Batson* because it struck Mr. Veitch due to his race. We disagree. In *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), the Court es-

tablished a three-part test for *Batson* objections: (1) the opponent of the strike must establish a *prima facie* case of racial discrimination; (2) the proponent must then provide a race-neutral explanation for the strike; and (3) the trial court must then judge the credibility of the proponent's explanation. *Id.* at 767, 115 S.Ct. at 1770–71. With respect to the second part of this test, the proponent's explanation does not need to be persuasive or even plausible, only "legitimate." *Id.* at 768–69, 115 S.Ct. at 1771 (stating that "a 'legitimate reason' is not a reason that necessarily makes sense, but a reason that does not deny equal protection").[4]

■  ¶ 17  The State provided three reasons for striking Mr. Veitch: (1) his opposition to the death penalty; (2) his conversation with Martinez' girlfriend; and (3) his possible sympathy toward Martinez because of his occupation. Mr. Veitch's jury questionnaire clearly stated that he opposed the death penalty and preferred life imprisonment as an option.[5] There was also evidence that Mr. Veitch engaged in a conversation with Martinez' girlfriend during a break. And finally, Mr. Veitch's occupation concerned the State because "pastors are forgiving." Thus, the State provided three race-neutral reasons for striking Mr. Veitch. This more than satisfies *Batson.*

■  ¶ 18  As his final *Batson* argument for Mr. Veitch, Martinez asserts that the failure to strike four similarly situated Caucasian jurors demonstrates the State's racial motivation for striking Mr. Veitch. But the other jurors were not similarly situated. Although each Caucasian juror showed some doubt about capital punishment, all four indicated on the jury questionnaire that they favored the death penalty. Mr. Veitch, on the other hand, indicated that he opposed the death penalty and suggested that life imprisonment "would work better." Jury Questionnaire # 47, Question 41(b). In addition, none of the Caucasian jurors had engaged in

4. *But see State v. Cruz,* 175 Ariz. 395, 399, 857 P.2d 1249, 1253 (1993).

In *State v. Bolton,* 182 Ariz. 290, 302, 896 P.2d ᴉ. 842 (1995), we held that "*Batson* does not

limit the use of peremptory challenges to exclude jurors because of their reservations about capital punishment."

a conversation with Martinez' girlfriend. There was no *Batson* violation.

### 2. *Article 2, Section 12*

■ ¶ 19  Martinez next argues that the State violated article 2, section 12 of the Arizona Constitution by striking Mr. Veitch on the basis of his religious affiliation. Article 2, section 12 provides in relevant part: "No religious qualification shall be required for any public office or employment, nor shall any person be incompetent as a witness or juror in consequence of his opinion on matters of religion...." Because Martinez failed to raise this argument below, it is waived absent fundamental error.

■ ¶ 20  For the reasons stated above, we do not believe the State's use of a strike against Mr. Veitch violated article 2, section 12 of the Arizona Constitution. But even if it did, "a *Batson* issue does not present fundamental error and a failure to raise it cannot be excused on that ground." *State v. Holder*, 155 Ariz. 83, 85, 745 P.2d 141, 143 (1987). Although Martinez' current argument is based upon article 2, section 12 of the Arizona Constitution, and not the Equal Protection clause of the Fourteenth Amendment, the fundamental error analysis is the same.

### 3. *Batson objection to venireperson Linda Preston*

¶ 21  In addition to striking Mr. Veitch, the State exercised one of its peremptory strikes on Linda Preston, a black woman. After Martinez challenged this strike under *Batson*, the State offered the following reasons for striking Ms. Preston:

The strike in terms of Linda Preston was made because of her views on the death penalty, Your Honor, and are racially and genderly neutral. Her feelings are very strong in that she states that some people that are innocent may accidentally lose their lives. Regardless of what they may say in response to questions like that, that's still an opinion they hold into the jury room, and I think I am entitled not to take a chance that that may sway their verdicts.

Tr. Sept. 8, 1997 at 162. The trial court then asked the State if it had any other concerns about Ms. Preston. The State responded:

I noticed that her brother was shot, and I don't know that he hasn't left some residual feelings with her. But in terms of that, it's basically her very, very strong beliefs on the death penalty issue, and her very strong opinions on that, because she also says that she would, in her response to, if you were charged with a similar offense, would you like people with your frame of mind? And she says: I hope they would have an opinion. And this is a very opinionated woman, and I feel that in terms of the death penalty issue, that it may sway her thinking.

*Id.* at 162–63. The trial court permitted the strike.

■ ¶ 22  On appeal, Martinez makes the same argument he made for Mr. Veitch and, again, fails to demonstrate error. As in the case of Mr. Veitch, the State provided three race-neutral reasons for striking Ms. Preston: (1) her strong opposition to the death penalty; (2) her strong opinions in general; and (3) her possible residual feelings about her brother's shooting. Martinez attacks these reasons and suggests that the record does not demonstrate that Ms. Preston was opinionated or that she was strongly opposed to the death penalty. But on her jury questionnaire, Ms. Preston clearly responded that she opposed the death penalty because "some people that are innocent may lose their lives." Jury Questionnaire # 50, Question 41(b). During voir dire, although the questions were ambiguous, she stated that it would be difficult for her to evaluate the evidence in this case and make a determination of guilt or innocence based only on the evidence due to her preconceived notions regarding the death penalty. *See* Tr. Sept. 8, 1997 at 101–02. Martinez concedes that the State's reason for striking Ms. Preston because of her brother is supported by the record. And, as in the case of Mr. Veitch, the Caucasian jurors were not similarly situated. There was no error.

### 4. *Refusal to strike venireperson Gail Schroeder for cause*

■ ¶ 23  Gail Schroeder provided several answers on her jury questionnaire that

suggested her potential inability to act as a fair and impartial juror. For example, in response to Question # 1, which asked if the jurors had any strong feelings about the case which might affect their ability to be fair and impartial, Ms. Schroeder stated, "I've already made up my mind from news reports but could be wrong." Jury Questionnaire # 80, Question 1. Two follow-up questions asked the potential jurors if their pre-existing opinions about the case could be set aside or changed. Ms. Schroeder answered, "No" to both questions. Jury Questionnaire # 80, Question 8. Ms. Schroeder also responded that she favored the death penalty and added that it was "not used enough." Jury Questionnaire # 80, Question 41. Curiously, when asked if she would be satisfied to have twelve people with her background and frame of mind decide her case if she were accused of a similar offense, Ms. Schroeder responded, "Yes. I feel I can be very impartial." Jury Questionnaire # 80, Question 50. On the next question, however, which asked, "In light of the subject matter of this case or the matters related above, or anything else, do you feel you could sit as a fair and impartial juror?", Ms. Schroeder answered, "No." Jury Questionnaire # 80, Question 51.

¶ 24  In light of these inconsistent answers, the trial court questioned Ms. Schroeder in chambers about her ability to serve as a fair and impartial juror. Ms. Schroeder retracted her earlier answers and provided consistent responses assuring the trial court that she could be fair and impartial. To the trial court's question, "[D]o you think that you still are of such an opinion that you can't be fair in this case?", Ms. Schroeder replied, "I think I can be fair." Tr. Sept. 8, 1997 at 141. The trial court then asked, "So whatever opinion that you had before, is it your thought that you can put that aside here?" Ms. Schroeder responded, "Yes." *Id.*

¶ 25  During this in chambers voir dire, Martinez' counsel specifically asked Ms. Schroeder about her response to Question # 51 and Ms. Schroeder responded that she did not know why she answered that she

could not sit as a fair and impartial juror. *Id.* at 142. He asked Ms. Schroeder again if she could be fair and impartial to which Ms. Schroeder answered, "Yes, I could." *Id.* at 143. He then asked Ms. Schroeder if she still had an opinion regarding Martinez' guilt based on the news reports she had heard. Ms. Schroeder replied, "News don't tell you all the facts so—I don't really have an opinion—I don't really have an opinion until I hear all the facts. I know that they don't always put all the facts in the paper or on the news." *Id.* The trial court then asked Ms. Schroeder a follow-up question on the burden of proof. Ms. Schroeder explained that she understood the presumption of innocence and agreed with that concept. After this questioning ended, Martinez' counsel moved to strike Ms. Schroeder for cause. The trial court denied this motion. Martinez then exercised one of his peremptory strikes to remove Ms. Schroeder from the panel.

¶ 26  On appeal, Martinez argues that from her responses to the questions on the jury questionnaire there were reasonable grounds to believe that Ms. Schroeder could not be fair and impartial. Martinez relies on *State v. Huerta,* 175 Ariz. 262, 264, 855 P.2d 776, 778 (1993) (holding that reversal is required if the court abused its discretion by failing to strike a juror for cause, and the defendant is required to use a peremptory strike to remove the challenged juror), to claim he was denied a substantial right because he had to exhaust one of his peremptory strikes on Ms. Schroeder who should have been stricken for cause.[6]

¶ 27  Because it was not error to fail to remove the juror for cause, the predicate for Martinez' argument fails. In *Huerta,* the challenged juror could not be rehabilitated. *Id.* at 262, 855 P.2d at 776. Here, Ms. Schroeder assured the trial court that she could be fair and impartial despite her earlier answers on the jury questionnaire. In response to the trial judge's question asking her whether she could be fair in this case, Ms. Schroeder specifically stated, "I think I

---

**6.** *But see United States v. Martinez–Salazar,* —— U.S. ——, ——, 120 S.Ct. 774, 782, 145 L.Ed.2d 792 (2000) (holding that "a defendant's exercise of peremptory challenges ... is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause").

can be fair." Tr. Sept. 8, 1997 at 141. She qualified her answers regarding the news reports she had heard and acknowledged that, "News don't tell you all the facts so—I don't really have an opinion." *Id.* at 143. She also retracted her answer to Question # 51, and said that she did not know why she answered that she could not sit as a fair and impartial juror.

¶ 28 A juror's preconceived notions or opinions about a case do not necessarily render that juror incompetent to fairly and impartially sit in a case. *State v. Poland*, 144 Ariz. 388, 398, 698 P.2d 183, 193 (1985), *aff'd*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986). "If a juror is willing to put aside his opinions and base his decision solely upon the evidence, he may serve." *Id.* The trial court can rehabilitate a challenged juror through follow-up questions to assure the court that he can sit as a fair and impartial juror. *See, e.g., State v. Walden*, 183 Ariz. 595, 609, 905 P.2d 974, 988 (1995); *State v. Chaney*, 141 Ariz. 295, 302–03, 686 P.2d 1265, 1272–73 (1984) (concluding that it was not abuse for the trial court to refuse to excuse the challenged juror for cause because he assured the court that he could render an impartial verdict). Ms. Schroeder provided assurances that she could sit as a fair and impartial juror and decide the case under the presumption of innocence. The trial court was in the best position to observe Ms. Schroeder's demeanor and judge her answers. We find no abuse.

### 5. *Other Acts Evidence*

¶ 29 Martinez next argues that the trial court abused its discretion by admitting evidence of: (1) Martinez' statements to Oscar Fryer about Martinez' outstanding warrant; and (2) Martinez' armed-robbery of a Mini–Mart in Blythe. Martinez concedes the relevance of this evidence, but asserts that its probative value was substantially outweighed by the danger of unfair prejudice under Rule 403, Ariz. R. Evid.

¶ 30 The trial court found the probative value of Martinez' statements to Fryer that "he had a warrant out for his arrest, that he was on the run, that he didn't want to go back to jail, and that he carried the gun in

case something happened," was not substantially outweighed by the danger of unfair prejudice. Minute Entry, Mar. 26, 1997 at 1. The trial court limited the evidence to show only that an arrest warrant had been issued and that Martinez knew about the warrant.

¶ 31 This evidence was extremely probative and clearly appropriate under Rule 403. These statements explained why Martinez acted as he did, and showed Martinez' motive for murdering Officer Martin. Martinez did not want to return to prison. He had a warrant out for his arrest and knew that if he were caught, he would be sent back to prison. Without his statements to Fryer, a jury could only speculate as to why Martinez shot Officer Martin.

¶ 32 The trial court also limited the State's evidence on the Mini–Mart robbery to the taking of cash from the store, the discharge of Officer Martin's .9mm Sig Sauer, and the underlying ballistics evidence. *Id.* at 2–3. The trial court precluded all references to the clerk's "murder, homicide, death or autopsy." *Id.* Martinez conceded that this evidence was relevant to establish identity and motive under Rule 404(b). *See* Defendant's Response to State's Motion to Admit Evidence Pursuant to Rule 404(b) at 9. He agreed that it linked Officer Martin's gun with Martinez' arrest in Indio. *Id.* He also acknowledged that the Mini–Mart robbery showed consciousness of guilt under *State v. Kemp*, 185 Ariz. 52, 59, 912 P.2d 1281, 1288 (1996). *Id.*

¶ 33 By his earlier concessions, Martinez agreed that the evidence about the Mini–Mart robbery was entitled to substantial probative weight. But on appeal, he attempts to retract his concessions, and asserts that engaging in a California convenience store robbery does not show consciousness of guilt as to the Arizona homicide. To the extent that we understand this argument, flight from Arizona demonstrates consciousness of guilt as much as flight within Arizona. The .9mm shell casing recovered at the Mini–Mart on August 16, 1995 provided the final link to Officer Martin's murder. Officer Martin's .9mm Sig Sauer was missing and the shell casing found at the Mini–Mart traced Mar-

tinez' flight from the Beeline Highway, through Phoenix, to Blythe, California. The trial court precluded the State from introducing evidence of the clerk's murder to prevent unfair prejudice. That was protection enough. The other evidence was extremely relevant. There was no error in the trial court's Rule 403 balancing.

### 6. *Non–Presence Jury Instruction*

█ ¶ 34 Martinez claims that the trial court abused its discretion when it refused to instruct the jury on the defense of non-presence. He maintains that conflicting eye-witness testimony demonstrated that two similar, yet different, blue cars traveled south down the Beeline Highway on August 15, 1995. This, he contends, entitled him to a jury instruction which suggested that he was not present at the scene of the homicide.[7]

¶ 35 Martinez relies on *State v. Rodriguez,* 192 Ariz. 58, 961 P.2d 1006 (1998), to support this argument. But in *Rodriguez,* the defendant requested an alibi instruction and presented corroborating alibi evidence. *See id.* at 62, 961 P.2d at 1010. Martinez failed to present such evidence here. He never explained his whereabouts on August 15, 1995, nor did he offer an alibi. He actually admitted that he traveled south down the Beeline Highway on the day Officer Martin was murdered. When the trial court asked about this discrepancy, Martinez' counsel had no explanation. *See* Tr. Sept. 24, 1997 at 124.

█ ¶ 36 While a party is entitled to have the court instruct the jury on any theory reasonably supported by the evidence, *see State v. Bolton,* 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995), a party is not entitled to an instruction when it is adequately covered by other instructions. *See Rodriguez,* 192 Ariz. at 61, 961 P.2d at 1009. Martinez' non-presence instruction simply repeated the State's burden of proving his guilt beyond a reasonable doubt. *Rodriguez* does not require redundancy. Nor does *Rodriguez*

mandate an alibi instruction when the evidence does not support it. The trial court did not abuse its discretion in refusing Martinez' non-presence jury instruction.

### 7. *Second Degree Murder Instruction*

█ ¶ 37 Martinez asserts that the trial court committed reversible error by deleting a paragraph of his proposed instruction for the lesser-included offense of second degree murder. The omitted paragraph read: "If you determine that the defendant is guilty of either first degree murder or second degree murder and you have a reasonable doubt as to which it was, you must find the defendant guilty of second degree murder." Defendant's Requested Jury Instructions at 40. The trial court refused this instruction based upon *State v. LeBlanc,* 186 Ariz. 437, 924 P.2d 441 (1996), where we abandoned the "acquittal first" procedure for lesser-included offenses in favor of the "reasonable efforts" procedure. *Id.* at 440, 924 P.2d at 444. We decided to require jurors to use "reasonable efforts" in reaching a verdict on the charged offense before considering lesser-included offenses. Thus, jurors do not have to acquit the defendant on the charged offense before considering lesser-included offenses.

¶ 38 In place of the omitted paragraph, the trial court gave the following instruction:

> You are to first consider the offense of first degree murder.
>
> If you cannot agree on a verdict on that charge after reasonable efforts, then you may consider whether the State has proven beyond a reasonable doubt that the defendant is guilty of the less serious offense of second degree murder.

Tr. Sept. 25, 1997 at 98. This instruction was not, as Martinez argues, improper. It did not fail to instruct the jury on the procedure when reasonable doubt exists on the degree of homicide. Rather, it expressly stated, "[y]ou are to first consider the offense of first degree murder." *Id.* If the jury could not agree that Martinez was guilty of

7. Martinez requested the following instruction: The State has the burden of proving that the defendant was present at the time and place the alleged crime was committed. If you have reasonable doubt whether the defendant was present at the time and place the alleged crime was committed, you must find the defendant not guilty.
Defendant's Requested Jury Instructions at 13.

first degree murder after reasonable efforts, then it was instructed to consider whether the State had proven, beyond a reasonable doubt, that Martinez was guilty of second degree murder. From the court's instruction, the jury could return a verdict of first degree murder only if the State proved Martinez' guilt beyond a reasonable doubt. If it had any doubts, the "reasonable efforts" instruction allowed the jury to consider the lesser-included offense of second degree murder. There was no error.

### B. *Sentencing Issues*

#### 1. *Aggravating Factors*

¶ 39 The trial court found the existence of the aggravating factors under A.R.S. § 13–703(F)(2) (defendant previously convicted of serious offense), and (F)(10) (murdered person on duty peace officer).

#### a. *Serious Offense*

¶ 40 On January 11, 1993, Martinez was convicted of Aggravated Assault, a class 3 felony in violation of A.R.S. §§ 13–1203(A)(2) and 13–1204(A)(2). On November 11, 1996, Martinez was convicted of two counts of Dangerous or Deadly Assault by a Prisoner, a class 2 felony in violation of A.R.S. §§ 13–1203 and 13–1206. Martinez concedes that his 1993 conviction for Aggravated Assault qualifies as a "serious offense" under A.R.S. § 13–703(F)(2) and (H)(1). But he argues the trial court erroneously found that his two 1996 convictions qualified as "serious offenses." First, he asserts that because Dangerous or Deadly Assault by a Prisoner is not included within the list of "serious offenses" in A.R.S. § 13–703(H), the trial court improperly considered his 1996 convictions. Next, he alleges that because one may, theoretically, commit assault recklessly, his 1996 convictions cannot qualify as serious offenses under A.R.S. § 13–703(F)(2) and (H)(1).

¶ 41 (1) In concluding that Martinez' 1996 convictions were (F)(2) aggravating factors, the trial court reasoned:

A comparison of the statutes shows that the crime of Dangerous or Deadly Assault by a Prisoner pursuant to A.R.S. § 13–1206 is the same as a section 13–1204(A)(2) aggravated assault committed by the use of a deadly weapon or dangerous instrument, with the additional element that the offense must be committed by a "prisoner." The jury instructions given in CR 96–01528 also bear this out. The offense of Dangerous or Deadly Assault by a Prisoner is deemed more "serious." It is a class 2 felony, rather than a class 3 felony, and unlike a section 13–1204(A)(2) aggravated assault, requires "flat time" and that the sentence be consecutive to any other sentence presently being served.

However, the definition of "serious offense" in section 13–703(H) is a list of described offenses and "Dangerous or Dearly Assault by a Prisoner" is not specifically listed. The current version of the (F)(2) aggravating circumstance was enacted in 1993 in order to remove ambiguities from the prior version's more vague reference to crimes involving "violence." There are no appellate decisions to guide this court in interpreting the current statute with regard to this issue. But there is really only one logical conclusion. The previous convictions were for aggravated assault committed by the use, threatened use or exhibition of a deadly weapon or dangerous instrument. That they were committed by a prisoner does not make them anything less or change that. If the offenses listed in A.R.S. § 13–703(H) were identified by statute numbers—if A.R.S. § 13–703(H)(4) [sic] read "aggravated assault pursuant to A.R.S. § 13–1204," for example—these previous convictions would not qualify as previous convictions for serious offenses under A.R.S. § 13–703(F)(2). But section 13–703(H) is not that specific. The convictions here are for aggravated assault committed by the use or threatened use or exhibition of a deadly weapon or dangerous instrument. They involved different victims. They each constitute a previous conviction of a serious offense under section 13–703(F)(2), and the court finds that they have been proved beyond a reasonable doubt.

Special Verdict at 3–4.

¶ 42 We agree. Pursuant to A.R.S. § 13–703(H)(1)(d), a "serious offense" in-

cludes "[a]ggravated assault resulting in serious physical injury or committed by the use, threatened use or exhibition of a deadly weapon or dangerous instrument." This offense can be committed under A.R.S. § 13–1204(A)(2) and A.R.S. § 13–1206. A.R.S. § 13–703(H)(1)(d) provides a broad definition for aggravated assault which encompasses all aggravated assaults "resulting in serious physical injury or committed by the use, threatened use or exhibition of a deadly weapon or dangerous instrument." Neither section is specifically listed, but both sections fully satisfy the statutory definition. A.R.S. § 13–1206 is simply aggravated assault for prisoners. As a class 2 felony, it is a more serious offense than A.R.S. § 13–1204, a class 3 felony. A conviction under it satisfies A.R.S. § 13–703(F)(2).[8]

¶ 43    (2) Martinez' argument regarding the theoretical possibility of committing reckless assault is based upon the erroneous assumption that the old (F)(2) concepts, *see State v. McKinney*, 185 Ariz. 567, 581, 917 P.2d 1214, 1228 (1996) (finding that the (F)(2) aggravating factor does not apply to offenses which can be committed recklessly), carry over to the new (F)(2). But in 1993, the legislature abandoned the (F)(2) language "use or threat of violence" and replaced it with "serious offense." In so doing, the legislature provided a list of "serious offenses" described at A.R.S. § 13–703(H)(1)(a) through (k). This list contains several crimes that can be committed recklessly. Manslaughter is included in the A.R.S. § 13–703(H)(1) list. By definition, a person can commit manslaughter by "[r]ecklessly causing the death of another person." A.R.S. § 13–1103(A)(1). A person can also commit aggravated assault recklessly. A.R.S. §§ 13–1203(A)(1) & 13–1204.

¶ 44    Martinez erroneously relies on *State v. Ysea*, 191 Ariz. 372, 379, 956 P.2d 499, 506 (1998) to support his *McKinney* argument. But like *McKinney*, *Ysea* addressed the (F)(2) aggravating factor before the 1993 amendments. We therefore agree with the

trial court that Martinez' 1996 convictions qualify as serious offenses under A.R.S. § 13–703(H)(1)(d).

b.    *Murdered Person On Duty Peace Officer*

¶ 45    The trial court found beyond any doubt that Officer Martin was an on duty peace officer killed in the course of performing his official duties, and that Martinez knew or should have known that Officer Martin was a peace officer. Officer Martin was in a marked police car and in uniform when he pulled Martinez over on August 15, 1995. Martinez conceded the existence of this aggravating factor under A.R.S. § 13–703(F)(10) at sentencing.

2.    *Mitigating Factors: Statutory*

¶ 46    At sentencing, Martinez asserted that the statutory mitigating factors found in A.R.S. § 13–703(G)(1) (significantly impaired capacity) and (G)(5)(age) existed at the time of the crime.

a.    *Significantly Impaired Capacity*

¶ 47    Although the trial court found that Martinez had a personality disorder which undoubtedly affected his conduct and behavior, it concluded that he did not prove by a preponderance of the evidence that his capacity to conform his conduct to the requirements of law was significantly impaired pursuant to A.R.S. § 13–703(G)(1). On appeal, Martinez concedes his ability to appreciate the wrongfulness of his conduct, but maintains that his ability to conform his conduct to the requirements of law was significantly impaired on August 15, 1995. Martinez points to his violent childhood during which his father regularly beat his mother in the presence of the children.

¶ 48    The beatings were not limited to Martinez' mother. Martinez and his sister, Julia, both suffered physical abuse at the hands of their father. Martinez' father

---

**8.** The sentencing judge noted in his Special Verdict that even if he based his finding of the (F)(2) aggravating factor solely on Martinez' 1993 conviction, he would have found that "the mitigating circumstances in this case, individually and cumulatively, are just not sufficiently substantial to outweigh the (F)(2) [1993 conviction] and (F)(10) aggravating circumstances." Special Verdict at 23.

would often paddle or whip Martinez with a belt. After the beatings, Martinez would show Julia the "big red welts on his legs and sometimes on his arms." Tr. July 9, 1998 at 150. To protect himself, Martinez began sleeping with a knife. This trauma adversely affected Martinez' development to such a degree that, at the age of fifteen, he was diagnosed as having characteristics of either borderline personality disorder or anti-social personality disorder.

¶ 49 At the aggravation/mitigation hearing, Martinez called Dr. Susan Parrish, Ph. D., to testify about his psychological condition. Dr. Parrish conducted a three hour psychological evaluation. She tested his intelligence and found that his IQ was well-above average (120 on the Wechsler Adult Intelligence Test; 100 is average). On the Minnesota Multiphasic Personality Inventory, Dr. Parrish diagnosed Martinez as suffering from "Post–Traumatic Stress Disorder [PTSD], and also Personality Disorder NOS, Not Otherwise Specified." Tr. July 22, 1998 at 16. She believed these disorders were due to Martinez' upbringing.

¶ 50 During her examination, Dr. Parrish discovered that Martinez displayed characteristics of impulsivity or failure to plan, irritability and aggressiveness, and reckless disregard for safety of self and others. She stated that these characteristics are commonly "associated with someone who comes from an environment where there was a prolonged exposure to violence." *Id.* at 31. Martinez was "a product of his environment and his nature . . . . [G]iven the environment that he had . . . the decision that . . . is the most salient is that he's going to survive." *Id.* at 51. Dr. Parrish explained that survival is the first thing that anyone with PTSD considers. A stressful event becomes a "life-and-death situation." *Id.* She testified that when Officer Martin stopped Martinez on the Beeline Highway, Martinez probably thought, "I'm not going back to prison. This man intends to put me in prison. It's me or him [sic]." *Id.* at 75. This led Dr. Parrish to conclude that Martinez was likely in a dissociative state at the time he shot Officer Martin.

¶ 51 The State retained Dr. Michael B. Bayless, Ph.D., to rebut Dr. Parrish's testimony. Dr. Bayless conducted his own examination of Martinez and found that Martinez scored 127 on the Shipley Institute of Living Scale intelligence test. A score of 127 is in the superior range. Dr. Bayless then reviewed Dr. Parrish's results on the Minnesota Multiphasic Personality Inventory and diagnosed Martinez as having Anti–Social Personality Disorder. He strongly disagreed with Dr. Parrish's diagnosis of PTSD because Martinez' record lacked any evidence of PTSD symptoms. Dr. Bayless suggested that "one would have seen symptoms of PTSD in his historical data and clinical data. . . ." Tr. July 31, 1998 at 19–20. Dr. Bayless explained:

> When you have PTSD, this is pervasive anxiety. Anxiety at such a level that it does interfere with your social and occupational functioning. It is not something that happens and goes away, happens and goes away. It is something that is pervasive. . . . It doesn't get smaller. It doesn't go away instantaneously. There is no evidence in the file, whatsoever, that I could find, to substantiate a diagnosis of PTSD with Martinez.

*Id.* at 21. This led Dr. Bayless to conclude that Martinez was not in a dissociative state when he murdered Officer Martin.

¶ 52 On appeal, Martinez argues that the trial court erroneously failed to find the existence of the A.R.S. § 13–703(G)(1) mitigating factor because, although "significant impairment" usually requires the existence of a mental disease or defect, *see State v. Stokley,* 182 Ariz. 505, 521–22, 898 P.2d 454, 470–71 (1995), lack of mental disease or defect does not preclude a(G)(1) finding. To support this argument, Martinez cites *State v. Trostle,* 191 Ariz. 4, 951 P.2d 869 (1997).

¶ 53 In *Trostle,* the defendant's mental health expert offered uncontroverted evidence of the defendant's mental impairment. *Id.* at 19, 951 P.2d at 884. But here, Dr. Parrish's findings were directly controverted by Dr. Bayless. Dr. Bayless strongly disagreed with Dr. Parrish's PTSD diagnosis. He believed that the only disorder Martinez may have had was Anti–Social Personality Disorder and that he was not in a dissociative state when he killed Officer Martin. The

trial court heard both experts testify and chose one over the other. *See State v. Doerr,* 193 Ariz. 56, 69, 969 P.2d 1168, 1181 (1998) (stating that "[t]he trial judge has broad discretion in determining the weight and credibility given to mental health evidence"). We agree with this finding.

¶ 54 Martinez next argues that the trial court gave too much weight to Oscar Fryer's testimony and to Martinez' actions after the homicide. Martinez argues that taking Officer Martin's gun, robbing the Mini–Mart and shooting the clerk are consistent with the "it's me or him" line of thought.

¶ 55 But we think Martinez' actions speak louder than Fryer's words. Even if we were to disregard Fryer's testimony, Martinez still emptied his .38 caliber handgun into Officer Martin. Using his "superior" intellect and after recognizing that he had just murdered an Arizona police officer, Martinez stole Officer Martin's .9mm Sig Sauer and drove to Blythe, California where he robbed a Mini–Mart and shot the clerk. Although Martinez alleges that the clerk "threatened" him with a chair or weapon, this does not support Dr. Parrish's PTSD diagnosis. Martinez could not have reasonably felt that it was "me or him." In fact, any threat Martinez may have feared was self-induced. He drove to Blythe and ran out of gas. He then called his aunt for money. After she failed to send the needed funds, he called her again. Losing his patience, he eventually robbed the Mini–Mart with Officer Martin's service weapon. The record does not suggest that the clerk randomly came up to Martinez in the parking lot, noticed the stolen car and threatened to call the police. Rather, Martinez' robbery and subsequent murder created any threat he may have felt.[9]

¶ 56 Martinez' actions in Indio also demonstrate his systematic thought processes and "superior" intelligence. At the first sight of the Indio police, Martinez didn't simply open fire even though he had two guns in his possession. Rather, he tried to flee after leaving the .38 caliber handgun

with David and Anna. Once Martinez reached Johnny Acuna's trailer and the police surrounded the compound, Martinez did not "come out shooting." He still had Officer Martin's .9mm Sig Sauer. This conflicts with Dr. Parrish's diagnosis. This was the ultimate "me or him" situation.

¶ 57 The trial court's finding that Martinez did not suffer from PTSD is supported by the evidence. His actions are not consistent with Dr. Parrish's diagnosis. He knew right from wrong. His IQ was well-above average. He consciously decided that "he wasn't going back to jail" and carried the .38 caliber handgun "[f]or protection and if shit happens." Tr. Sept. 9, 1997 at 83, 85. Without more, we believe that Martinez' personality disorder does not qualify as a statutory mitigating circumstance. *See State v. Kayer,* 194 Ariz. 423, 437, 984 P.2d 31, 45 (1999) (stating that "personality or character disorders usually are not sufficient to satisfy [the (G)(1) ] statutory mitigator"); *State v. Brewer,* 170 Ariz. 486, 505, 826 P.2d 783, 802 (1992) ("Generally, a mere character or personality disorder alone is insufficient to constitute a mitigating circumstance."). But even if it did, there was simply no causal connection between Martinez' personality disorder and his actions on August 15, 1995. *See State v. Clabourne,* 194 Ariz. 379, 385, 983 P.2d 748, 754 (1999) (stating that "[i]n every case in which we have found the (G)(1) factor, the mental illness was 'not only a substantial mitigating factor . . . but a *major contributing cause* of [the defendant's] conduct that was 'sufficiently substantial' to outweigh the aggravating factors present . . . .' ") (quoting *State v. Jimenez,* 165 Ariz. 444, 459, 799 P.2d 785, 800 (1990) (when voices told defendant to kill he could not control what he was doing) (emphasis added)), *cert. denied by, Clabourne v. Arizona,* — U.S. ——, 120 S.Ct. 1439, 146 L.Ed.2d 327 (2000); *see also State v. Stuard,* 176 Ariz. 589, 608 n. 12, 863 P.2d 881, 900 n. 12 (1993) ("[E]vidence of causation is required before mental impairment can be considered a significant mitigating factor."). Martinez failed

---

9. Martinez also created the threat of being caught by Officer Martin when he excessively

sped down the Beeline Highway.

to establish the existence of the A.R.S. § 13–703(G)(1) factor by a preponderance of the evidence.

### b. *Age*

¶ 58 Martinez was 19 years and 9 months old at the time of the murder. The trial court found that Martinez' age qualified under A.R.S. § 13–703(G)(5) as a mitigating factor but did not give it substantial weight because of Martinez' level of intelligence, and significant past experience with the criminal justice system. Both Dr. Parrish and Dr. Bayless diagnosed Martinez as having superior intelligence. He had multiple juvenile referrals and convictions, and three felony convictions during his relatively brief time in the adult system before he killed Officer Martin. We agree that Martinez' age was entitled to little or no weight as a mitigating factor. *See State v. Jackson,* 186 Ariz. 20, 30–31, 918 P.2d 1038, 1048–49 (1996) (finding that, in addition to chronological age, we must consider a defendant's: (1) level of intelligence, (2) maturity, (3) participation in the murder, and (4) criminal history and past experience with law enforcement).

### 3. *Mitigating Factors: Non–Statutory*

¶ 59 The trial court found that Martinez' personality disorder and family history qualified as non-statutory mitigating factors but refused to give them substantial weight.

### a. *Personality Disorder*

¶ 60 The trial court found that Martinez' personality disorder was a non-statutory mitigating factor, but did not give it substantial weight because Martinez failed to establish a sufficient causal link between his personality disorder and his conduct on August 15, 1995. It reasoned that "Dr. Bayless concluded that [Martinez] was not acting in a merely reactionary way, but that he was simply acting in his perceived self-interest." Special Verdict at 17–18. It further supported its decision with Fryer's testimony and Martinez' "ability to plan, to think rationally and to make choices .even when 'threatened' as he would have been when he was confronted and subsequently apprehended by law enforcement officers after the

murder." *Id.* at 18. Martinez asserts that this was error in light of Dr. Parrish's testimony.

¶ 61 Although we addressed this argument above, we note again that Martinez' conduct before and after the murder is inconsistent with Dr. Parrish's diagnosis. Martinez may have suffered from a personality disorder at the time he killed Officer Martin. But this personality disorder did not impair his ability to conform his conduct to the requirements of the law. Martinez told Fryer that he had the .38 caliber handgun "[f]or protection and if shit happens." Tr. Sept. 9, 1997 at 83. He also told Fryer that "he wasn't going back to jail." *Id.* at 85. Martinez shot Officer Martin to further his goal. Any personality disorder Martinez may have had did not influence that decision. We therefore agree with the trial court that this factor does not warrant substantial weight. *See State v. Medina,* 193 Ariz. 504, 517, 975 P.2d 94, 107 (1999) (finding that, although the defendant proved his anti-social personality disorder by a preponderance of the evidence, the trial court correctly gave it little or no mitigating weight because his conduct was the result of his voluntary choice).

### b. *Family History*

¶ 62 The trial court found that Martinez' family background qualified as a non-statutory mitigating factor, but did not give it substantial weight because it did not significantly affect his "ability to perceive, to comprehend or to control his actions when Officer Martin pulled him over on the Beeline Highway." Special Verdict at 19. Again, Martinez argues that this was error and relies on Dr. Parrish's opinions.

¶ 63 Although Dr. Parrish testified that Martinez adopted a "survival" state of mind due to his violent upbringing, this did not affect his conduct on August 15, 1995. There is simply no nexus between Martinez' family history and his actions on the Beeline Highway. His family history, though regrettable, is not entitled to weight as a non-statutory mitigating factor.

*4. Independent Review*

 ¶ 64   Upon independent review, we find that the mitigating circumstances are not sufficiently substantial to warrant leniency in light of the aggravating factors.

## IV.   DISPOSITION

¶ 65   For the foregoing reasons, we affirm Martinez' convictions and sentences.

CONCURRING: THOMAS A. ZLAKET, Chief Justice, CHARLES E. JONES, Vice Chief Justice, STANLEY G. FELDMAN, Justice, and RUTH V. McGREGOR, Justice.