762 P.2d 545
**STATE of Arizona, Appellee,**

v.

**George Villegas LOPEZ, Appellant.**

**No. CR–86–0155–AP.**

Supreme Court of Arizona,
En Banc.

Sept. 22, 1988.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Janet Keating, Asst. Attys. Gen., Phoenix, for appellee.

John M. Antieau, Phoenix, for appellant.

MOELLER, Justice.

## JURISDICTION

Defendant George Villegas Lopez and his brother, Jose Villegas Lopez, were jointly indicted for armed robbery and first degree murder. The murder charge alleged a premeditated murder or, in the alternative, a felony murder. The offenses were alleged to have been committed on October 4, 1985, against the victim identified in the indictment as "Hugo L. Munoz, aka Macario Suarez." [1]

Upon motion, the trial court severed defendant's trial from that of his brother. The brother, Jose Lopez, pled guilty to first degree murder and received a stipulated term of life imprisonment. On appeal, we affirmed his conviction. *State v. Lopez*, 153 Ariz. 285, 736 P.2d 369 (1987).

Meanwhile, defendant's case proceeded to a jury trial. At the close of the state's case, defendant moved for judgment of acquittal on the armed robbery charge, citing an insufficiency of evidence. He also moved for judgment of acquittal on the felony murder charge on the same grounds, because the armed robbery was the predicate felony for the felony murder charge. Finally, he moved to dismiss the premeditated murder charge, claiming an insufficiency of evidence to support a finding of premeditation. The trial court denied these motions, as well as similar defense motions made at the close of the state's case. The jury found defendant guilty of both armed robbery and first degree murder. After denial of defendant's motion for a new trial, he was sentenced to a term of fourteen years imprisonment for armed robbery and to death for first degree murder.

Appeal to this court is automatic, Ariz.R. Crim.P. 26.15 and 31.2(b) 17 A.R.S. We have jurisdiction under Ariz.Const. art. 6, § 5(3) and A.R.S. §§ 13–4031, –4033, and –4035.

## FACTS

On October 5, 1985, two young people reported seeing a body floating in the Roosevelt Canal west of Phoenix in Maricopa County. The body had visible stab wounds and head lacerations; its hands and feet were tied. There was no identification on the body, but it was later determined to be that of Macario Suarez. The medical examiner who conducted the autopsy determined that Suarez had suffered seven stab wounds plus a number of crushing blows to the skull with a blunt instrument, such as a jack handle. These injuries combined to cause Suarez' death and he was dead before his body was placed in the canal.

The evening before his body was discovered, Suarez had been in the company of defendant George Lopez, the defendant's brother Jose Lopez, and Jose's girl friend, Tracy Fulkerson. Earlier that afternoon the Lopez brothers and Fulkerson had visited Suarez at his place of employment. Jose Lopez and Suarez discussed some plans for the four individuals to get together and go cruising in Suarez' car later that evening. At approximately 7:00 p.m. that evening Suarez, driving his Monte Carlo, picked up the three individuals at a park, and the four of them drove around Phoenix for several hours. Twice they stopped at a convenience store and Suarez bought beer for all of them. They also smoked some marijuana that Suarez provided.

At one point in the evening the four drove to the top of South Mountain where they continued to drink beer and smoke marijuana. Either defendant or his brother drove Suarez' car back down the mountain and then Suarez resumed driving. Fulkerson was dropped off at her home at about 10:00 p.m.

---

1. The victim's correct name was Macario Suarez, an illegal alien who used the alias Hugo L. Munoz, in whose name his car was registered.

A little after midnight, defendant and his brother Jose arrived at their brother Frank's home driving Suarez' car, but without Suarez. There was a brief conversation, some items were removed from the trunk of the car, and the defendant and his brother dumped some items in a garbage can near Frank Lopez' home. Defendant and his brother appeared as if they had been drinking. Neither had any injuries to his face or hands. A witness noticed what appeared to be blood on Jose Lopez' shoes and socks.

The police later recovered several items that the Lopez brothers had placed in the garbage can. These included a piece of brown carpeting, a black rubber hose, a piece of sand paper, a funnel-shaped piece of filter paper, a chamois, a brown paper bag and a cardboard box. All of the items appeared to be blood stained. These items were tested and found to contain human blood which could not have come from either of the Lopez brothers, but could have come from Suarez. No identifiable latent fingerprints were found on the items.

In the early morning hours of October 5, sometime after the late night activity at Frank Lopez' house, the Phoenix Fire Department investigated a car fire at approximately 3100 West Taylor in the alley. At trial, defendant claimed to have parked the car in an alley behind a friend's house at 33rd Avenue and Melvin, several blocks from where the car was found by the Phoenix Fire Department. The car, Suarez' Monte Carlo, was still smoldering when an arson investigator arrived just after firefighters had extinguished the blaze. The arson investigator ruled out accidental causes for the fire and determined that it had been deliberately set by igniting a flammable liquid which had been poured throughout the interior of the car.

Defendant and his brother were stopped by Phoenix police on the morning of October 7, 1985, and taken to police headquarters for questioning. Defendant's resulting statement to the police and his conflicting trial testimony constitute the only direct testimonial evidence concerning what allegedly happened to Suarez.

After being advised of his *Miranda* rights, defendant initially denied any knowledge of the death of Suarez. However, after being shown a photograph of Suarez, the defendant admitted that he had killed him. The defendant stated that a fight had started when Suarez, for no apparent reason, came at him with a knife. In this initial statement, defendant claimed that he first disarmed the victim and then killed him. He claimed his brother's only involvement had been to help him put the body in the trunk of the car and then, at the canal, to help tie the body up and put it in the canal.

Both in this initial statement and at trial, defendant said that he and his brother drove around for a while after dumping Suarez' body in the canal. Then they went to Frank's house and disposed of the items from the trunk. Defendant said that he then went to a party at a friend's house, where he parked Suarez' car and left the keys in the ignition. According to him, the next morning the car was gone.

After the police interview, the defendant led the investigating officers on a trip throughout west Phoenix, directing them to a vacant lot where Suarez had been killed, to an alley where Suarez' wallet and defendant's T-shirt had been thrown in a trash can, and to the canal bank where Suarez' body had been trussed up and thrown in the canal.

During the questioning, the investigating officers had observed blood stains on the defendant's undershorts that were visible above his pants. Defendant's shorts, trousers and T-shirt were impounded by police upon his arrest. Later testing showed that the blood on the undershorts could not have come from defendant or his brother, but could have come from Suarez.

At trial, defendant's testimony varied significantly from his statement made to the officers on October 7, 1985. He explained the differences by saying that in his October 7, 1985, statement he was trying to protect his brother. By the time of the trial, his brother had pled and been sentenced. At trial, defendant continued to assert that Suarez had come at him with a

knife. However, he denied that he killed Suarez and testified, instead, that he had quickly disarmed Suarez and his brother alone had then killed him by repeatedly. stabbing him and hitting him with the jack handle.

## ISSUES

Defendant raises numerous issues on appeal with respect to both the guilt phase and the sentencing phase of his trial. Because of the manner in which we dispose of the issues, we need only resolve the following questions:

1) Was there sufficient evidence to submit the issue of premeditation to the jury?

2) Was there sufficient evidence to submit the armed robbery charge and, therefore, the felony murder charge, to the jury?

3) Was the jury adequately instructed on the defense of justification?

## PREMEDITATION

■ The trial court submitted the issue of premeditated murder to the jury along with the lesser-included offenses of second degree murder and manslaughter. Defendant claims there was insufficient evidence to justify submission of the issue of premeditation. Unless there is a complete absence of probative evidence to support a particular finding, it is appropriate to submit the issue to the jury. *State v. Girdler*, 138 Ariz. 482, 488, 675 P.2d 1301, 1307 (1983), *cert. denied*, 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 826 (1984). Using this standard, our review of the record persuades us that the issue of premeditation was properly submitted to the jury in this case.

"Premeditation" is defined by statute as follows:

[T]hat the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if

it is the instant effect of a sudden quarrel or heat of passion.

A.R.S. § 13–1101(1).

The case law regarding premeditation is clear and was summarized in *State v. Kreps*, 146 Ariz. 446, 449, 706 P.2d 1213, 1216 (1985), as follows:

The state bears the burden of proving premeditation beyond a reasonable doubt. *State v. White*, 144 Ariz. 245, 697 P.2d 328 (1985). To make this showing, the state "must prove that the defendant made a decision to kill prior to the act of killing, that 'a plan to murder was formed after the matter had been made a subject of deliberation and reflection.'" *State v. Lacquey*, 117 Ariz. 231, 234, 571 P.2d 1027, 1030 (1977), *quoting Macias v. State*, 36 Ariz. 140, 149, 283 P. 711, 715 (1929). The necessary premeditation, however, may be as instantaneous as successive thoughts of the mind and may be proven by either direct or circumstantial evidence. *State v. Hunter*, 136 Ariz. 45, 48, 664 P.2d 195, 198 (1983).

■ Viewing the evidence in the light most favorable to the state, we conclude that a rational trier-of-fact could find that defendant premeditated the murder of Suarez. Although defendant testified at trial that his brother killed Suarez after Suarez attacked defendant, a review of the transcript and exhibits demonstrates that there was an abundance of conflicting physical and testimonial evidence (including defendant's own earlier statement) that would support a jury finding that defendant killed Suarez and did so with premeditation.

The appearances of defendant and his brother following the murder contradicted defendant's testimony at trial that both he and his brother had fought with the victim before defendant's brother killed him. Shortly after the killing, neither defendant nor his brother had any injuries to his face or hands. Defendant's clothing was in good condition, was not wrinkled, and was "pretty clean." Photographs of defendant taken October 7, less than three days after the killing, show no injuries to his face or hands, a significant fact inconsistent with

his "fight" story and inferentially consistent with a theory of premeditation.

The nature, severity and placement of the injuries to the victim also provide some evidence of premeditation. The victim was brutally beaten, and several of his injuries would have individually caused his death. The pathologist said he would have remained conscious for only a brief time after sustaining the first of his injuries. His front tooth had been knocked out. There were fractures of the skull and seven lacerations in the scalp area on the left side of Suarez' head, starting from just above the left eye to just above the apex of the head. These lacerations varied in length from 3.5 centimeters to 6 centimeters. At the base of the skull there were multiple fractures, injuring the brain with contusions, swelling, and some hemorrhage from the blunt force injury. There were also six stab wounds on Suarez' chest, abdomen, *and back*. The stab wounds to the abdomen included a wound that injured the inferior vena cava, which is the vein against the backbone of the body. The wounds to the chest included a wound that injured the lung and hemorrhaged into the chest cavity. One stab wound to the back caused laceration of the liver, including hemorrhage in and around the liver and into the chest cavity. The doctor also identified another stab wound in the lower back, which penetrated soft tissue but no vital organs.

Defendant told two very different versions of the fight story, one to the police after his arrest, and a second during his trial. Neither version remotely justified the number or type of wounds the victim suffered. Based upon our review of the record, we conclude that there was sufficient evidence to support a finding of premeditation. The trial court properly denied defendant's motion for judgment of acquittal and motion for new trial based on alleged insufficiency of evidence of premeditation.

## ARMED ROBBERY AND FELONY MURDER

Defendant moved for judgment of acquittal on the armed robbery count, contending that the evidence was insufficient. He also moved for judgment of acquittal on the felony murder theory, because the armed robbery was the predicate felony for the felony murder charge. He renewed the motions at the close of the state's case and also made a post-trial motion for a new trial on the same grounds.

■ A.R.S. § 13–1902(A) defines robbery as follows:

A person commits robbery if in the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property.

A.R.S. § 13–1904(A) converts a "robbery" into an "armed robbery" when a deadly weapon or dangerous instrument is used or threatened to be used.

The state contends that taking the victim's car and billfold constituted an "armed robbery." Defendant, on the other hand, contends that the car and billfold were taken after the victim's death, and that there is no evidence that the earlier use of force against the victim was accompanied by an intent to commit a robbery. Based on the record before us, we are constrained to agree with defendant. We have previously held that the elements of an armed robbery are:

[T]hat defendant (1) while armed with a deadly weapon, (2) took property from another person against that person's will, and (3) in the course of taking the property, defendant threatened or used force against that person with the intent to deprive them of their property. A.R.S. §§ 13–1902, –1904. *Stated otherwise, there must be evidence establishing that defendant's intent to commit robbery was coexistent with his use of force.*

*State v. Wallace,* 151 Ariz. 362, 365, 728 P.2d 232, 235 (1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3243, 97 L.Ed.2d 748 (1987) (emphasis added).

■ In closing argument, the state suggested that defendant and his brother had "lured" Suarez to the site of the killing for the purpose of robbing him of his car and of the money in his wallet. However, no evidence supports this argument. In *State v. Wallace, supra*, a defendant's guilty plea to armed robbery was set aside because the defendant's use of force upon the victim was not intended to coerce surrender of her money and her truck, which were stolen after her murder. Defendant's intent to take those items was formed only after the victim was dead. We noted:

> While defendant's actions may render him liable for another crime, the takings did not amount to armed robbery.

151 Ariz. at 366, 728 P.2d at 236.

In this case, after the death of Suarez, the defendant and his brother took the car and the billfold for the purpose of removing themselves from the scene, to attempt to prevent or delay identification of the body, and to destroy evidence. Nothing supports a finding that they had an intent to commit a robbery while they were using force against Suarez.

■ Clearly, force was used on the victim and, just as clearly, property was later taken from him. However, the state failed to prove that the force was inflicted *in the course* of taking the property. The statutory definition of "in the course of committing" contained in A.R.S. § 13–1901(2) avails the state nothing because it presupposes *a robbery* has been committed. When the use of force and the taking of property are not contemporaneous, there may be a theft, but there is not a robbery. *See State v. Kinkade*, 147 Ariz. 250, 253, 709 P.2d 884, 887 (1985); *State v. McNair*, 141 Ariz. 475, 482, 687 P.2d 1230, 1237 (1984); *State v. Celaya*, 135 Ariz. 248, 252, 660 P.2d 849, 853 (1983).

The state contends that the court of appeals case of *State v. Miguel*, 125 Ariz. 538, 611 P.2d 125 (App.1980), supports its position that an armed robbery occurred here. It does not. There, one of the victims of a robbery was intoxicated and asleep when the robbery began and did not fully awaken during the robbery. The defendant argued that, as a matter of law, (1) there could be no force or threat of force against a voluntarily unconscious victim; and (2) there could be no taking of property against the will of such a victim. The court rejected both of these arguments. First, the court noted that under our robbery statute, the force could be directed against someone other than the one from whom the property is taken. The court then held that there was evidence of force used "with the intent to prevent resistance to the taking of ... [the victim's money]," which force was used against the victim as well as against other persons. With respect to the argument that there could be no taking of property against the will of an unconscious victim, the court merely held that it may be presumed that a taking is against a victim's will when the evidence shows beyond a reasonable doubt that the victim had not consented to the taking and was physically unable to do so, whether from voluntary or involuntary causes.

■ Obviously, we are not saying that a defendant immunizes himself from a robbery conviction by killing the victim. What we are saying is that the robbery statute requires the coexistence of an intent to commit a robbery with the use of force. If a murder is committed with no intent to commit a robbery, it is still murder but it is not armed robbery. If a theft is conceived of, and executed after a murder, it is a theft but it is not an armed robbery.

■ Because the evidence did not support the armed robbery charge, the trial court should have granted defendant's motion for acquittal as to it. Because the offense of theft, which was supported by the evidence, is not a predicate felony for felony murder under A.R.S. § 13–1105(A)(2), the trial court also should have granted a judgment of acquittal with respect to the felony murder theory.

## INSTRUCTIONS ON JUSTIFICATION

Defendant filed a written request with the trial court that A.R.S. §§ 13–404, –405, and –406 be read to the jury. These three statutes all relate to the defense of justifi-

cation and cover, respectively, "self-defense," "use of deadly physical force," and "defense of a third person." The trial judge indicated that he felt such requests were adequately covered by the instructions he intended to give. He instructed the jury on self-defense justification as follows:

> The defendant was justified in using or threatening physical force in self-defense if the following two conditions existed: One, a reasonable person in the defendant's situation would have believed that physical force was immediately necessary to protect against another's use or intended use of physical force; and two, the defendant used or threatened no more physical force than would have appeared necessary to a reasonable person in the defendant's situation.
>
> Self-defense justifies the use or threat of physical force only while the apparent danger continues. The right to use physical force in self-defense ends when the apparent danger ends.
>
> Actual danger is not necessary to justify the use of physical force in self-defense. It is enough if a reasonable person in the defendant's situation would have believed that he was in the immediate physical danger.
>
> The state has the burden of proving the physical force was not justified; therefore, you must be satisfied beyond a reasonable doubt that the use of physical force was not justified before you find the defendant guilty.
>
> If there exists in your mind a reasonable doubt as to whether the defendant was acting in self-defense, you must resolve such doubt in favor of the defendant and find him not guilty.

In the trial court, the defendant did not object to the failure to give an instruction based on A.R.S. § 13–405 concerning the use of deadly physical force; therefore, we do not consider his argument on appeal that it should have been given. Ariz.R. Crim.P. 21.3 17 A.R.S.; *State v. Schad*, 129 Ariz. 557, 633 P.2d 366 (1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982).

Defense counsel did enter a general objection to the trial court's failure to read A.R.S. § 13–406 concerning defense of a third person. The only grounds stated in support of the objection were "because I feel there was a third party involved, namely, the brother." On appeal, appellate counsel contends the instruction was required because the jury could find that defendant's brother, Jose, was justified in killing Suarez in defense of the defendant. Even assuming the objection was sufficient to preserve the point, we find no error. Since there is a complete dearth of physical or non-party testimonial evidence to support any theory of justification, such support must be found in one of the defendant's two versions of the killing. Under neither version could Jose Lopez be found to be justified in killing Suarez in defense of his brother George Lopez. Because the requested instruction did not fit the facts of the case, it was not error to refuse it. *State v. Lambright*, 138 Ariz. 63, 74, 673 P.2d 1, 12 (1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984).

On this record, there was no error relative to the justification instructions. Under the evidence, the trial court gave the defendant the benefit of the doubt by giving a self-defense instruction. The decision as to which, if any, justification instructions to give is always a fact-intensive one. Because we are remanding for a new trial on other grounds, and because the evidence in this case seems somewhat fluid, we caution that the applicability of any justification instruction will have to be determined anew on any record made at a second trial.

## CONCLUSION AND DISPOSITION

Defendant's motion for acquittal on the armed robbery count should have been granted. Defendant's conviction on that count is reversed with directions to enter a judgment of acquittal. Defendant's motion for acquittal on the felony murder theory should similarly have been granted because there was no predicate felony of armed robbery shown.

At the request of the state, the trial court instructed the jurors that if they agreed that defendant was guilty of first degree murder, they need not agree whether it was premeditated murder or felony murder. This was in accordance with existing Arizona procedure. *State v. Gillies*, 135 Ariz. 500, 510, 662 P.2d 1007, 1017 (1983), *appeal after remand*, 142 Ariz. 564, 691 P.2d 655 (1984), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985). However, since the jury's verdict may have been based, in whole or in part, on the impermissible felony murder theory, we must reverse defendant's conviction for first degree murder and remand that count for a new trial on the premeditation theory only. Since we are remanding for a new trial on guilt, we do not reach any issues asserted relative to the sentencing phase.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and HOLOHAN, JJ., concur.