4 P.3d 369

**STATE of Arizona, Appellee.**

v.

**Frank Winfield ANDERSON, Appellant.**

No. CR–98–0294–AP.

Supreme Court of Arizona, En Banc.

June 15, 2000.

 

Janet A. Napolitano, Arizona Attorney General By: Paul J. McMurdie, Jim D. Nielsen, Phoenix, for State of Arizona.

Wisdom & Logan By: James L.P. Logan, Phoenix, for Frank Winfield Anderson.

## O P I N I O N

FELDMAN, Justice.

¶ 1 Frank Winfield Anderson (Defendant) was convicted of armed robbery, conspiracy to commit murder, and three counts of first-degree murder. He was sentenced to death for each of the murders, life with possibility of parole in twenty-five years for conspiracy, and twelve and one-half years to be served consecutively for armed robbery. This is an automatic direct appeal under A.R.S. § 13–4031 and Ariz.R.Crim.P. 26.15 and 31.2(b). We have jurisdiction pursuant to Ariz. Const. art. VI, § 5(3) and A.R.S. §§ 13–4031 and 13–4033. For the reasons stated below, Defendant's conviction is reversed. We therefore limit our discussion to the dispositive issues and those that may arise at retrial.

## FACTS

¶ 2 The facts necessary for resolution of this case come primarily from statements Defendant made to police after his arrest. Defendant and his traveling companion, Kimberly Lane, were hitchhiking from California to Kingman, Arizona. They were picked up in Las Vegas by an unidentified driver and taken to Golden Valley, Arizona. The driver suggested that because the hour was late, Defendant and Lane should consider staying with the Kagens, who lived nearby, rather than proceed into Kingman that night. Defendant and Lane agreed, and after the driver left them at the Kagen home, they were taken in by the Kagens. Residing at the home were Leta and Elliot Kagen, Leta's son Robert Delahunt, and two others—Roland Wear and Robert "Bobby" Poyson. At the time Defendant arrived, Elliot Kagen was attending a sick friend in Kingman and was not expected to return for several days.

¶ 3 Upon arrival, Defendant and Lane played cards with the other residents for several hours before retiring. The following day everyone went to Kingman, where Defendant and Lane looked for work while the others registered Delahunt for school. When they returned, Defendant and Lane discussed their dislike for the Kagen home and their desire to continue hitchhiking. Their dilemma was that they were seventeen miles from Kingman and had no means of transportation. Poyson overheard this discussion and told them that he could help them leave. Poyson suggested that they wait until Elliot returned, then rob and kill him, Leta, Delahunt, and Wear, and steal Wear's pick-up truck. Defendant, Poyson, and Lane decided not to wait for Elliot but to proceed with the plan to kill Delahunt, Leta, and Wear. The plan was consummated, the three victims killed, and after stealing several items from the Kagens' house, Defendant, Poyson, and Lane left in Wear's truck. Defendant was arrested five days later in Southern Illinois, still driving the truck and carrying some of Leta's belongings. Poyson and Lane were arrested several days later. While in custody, Defendant made a full confession to the murders, admitting they were premeditated.

## DISCUSSION

**A. Exclusion of jurors who objected to the death penalty on moral or religious grounds**

■ ¶ 4 The trial judge exercised his discretion to use a written jury questionnaire, as is permitted by Ariz.R.Crim.P. 18.5. The venire persons whose names had been drawn were asked to report to the courthouse, where they were sworn in, introduced to counsel and Defendant, given the stock cau-

tionary instruction, given the questionnaire, and instructed on how to fill it out. The preface to the questionnaire said the answers would "have the effect of a statement given to the court under oath." Once they delivered the completed document to the clerk, the venire persons were free to leave but were instructed to return the next day unless called and excused.[1]

¶ 5 The lawyers and the judge met in the afternoon to review the completed questionnaires. Persons not discharged as a result of the afternoon discussions would return the following morning for oral voir dire. During the discussion in chambers, the judge and counsel discovered that in answering questions 9(A) and 9(B) of the questionnaire, three prospective jurors stated that they were opposed to the death penalty on moral or religious grounds *and* could not set aside these beliefs. All three were removed from the jury pool for cause over defense counsel's objection and request that he be allowed oral voir dire that might rehabilitate them. Defendant contends the trial judge erred and his constitutional right to an impartial jury was violated when he was convicted by a jury from which all who held religious and conscientious objections to the death penalty were excluded. U.S. Const. amend. VI; Ariz. Const. art. II, § 23.

■ ¶ 6 The United States Supreme Court has held that the Sixth Amendment is violated if the trial jury in a capital case is chosen by excluding for cause persons who have general objections to the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). A general objection to the death penalty is not sufficient to create a presumption that a prospective juror is unfit because of bias to sit on the panel. The Court's language was quite clear:

> It is, of course, settled that a State may not entrust the determination of whether a man is innocent or guilty to a tribunal 'organized to convict.' It requires but a short step from that principle to hold, as we do today, that a State may not entrust the determination of whether a man should

live or die to a tribunal organized to return a verdict of death. Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.

*Id.* at 521–23, 88 S.Ct. at 1776–77 (citations and footnotes omitted).

■ ¶ 7 However, this rule is not applicable to prospective jurors who state unequivocally that they could never impose the death penalty regardless of the facts of the particular case. *Id.* at 514, 88 S.Ct. at 1772; *see also Morgan v. Illinois*, 504 U.S. 719, 734 n. 7, 112 S.Ct. 2222, 2232 n. 7, 119 L.Ed.2d 492 (1992) ("The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case. Clearly, the extremes must be eliminated—i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence.").

¶ 8 In the present case, question 9(B) of the written questionnaire asked: "Could you set aside any conscientious or religious feelings you might have against the death penalty and impartially weigh the evidence in this case and render a verdict in accordance with the law?" All three prospective jurors marked the box indicating they could not. If this was their final and unequivocal position, excusing them did not violate the rule of *Witherspoon* and *Morgan* by depriving Defendant of an impartial jury.

■ ¶ 9 In determining whether a prospective juror's attitude toward the death penalty is so fixed as to require exclusion from the jury, we apply the *Witherspoon* standard as modified by *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). In *Wainwright*, the Court held that a person's opposition to the death penalty

---

1. Those who returned the following day were not again sworn. The oath that preceded voir dire and is required by Ariz.R.Crim.P. 18.5(a) was only given before the questionnaires were distributed, answered, and filed.

need not be proved with "unmistakable clarity," but a prospective juror may be excused if his views "would prevent or substantially impair the performance of his duties as a juror...." *Id.* at 424, 105 S.Ct. at 852 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2528, 65 L.Ed.2d 581 (1980)). Arizona adopted an identical standard in *State v. Martinez–Villareal,* 145 Ariz. 441, 449, 702 P.2d 670, 678 (1985). In Arizona, "[d]isqualification when a juror states his inability to be impartial is not only permissible but imperative." *State v. Wiley,* 144 Ariz. 525, 534, 698 P.2d 1244, 1253 (1985) (overruled on other grounds by *State v. Superior Court,* 157 Ariz. 541, 760 P.2d 541 (1988)); *see also State v. Willoughby,* 181 Ariz. 530, 892 P.2d 1319 (1995) (excusing venire person who could not convict due to religious opposition to the death penalty does not violate state constitutional provision against disqualification based on religious beliefs).

▪ ¶ 10 In the present case, the trial judge's denial of questioning beyond the prospective jurors' written answers forces us to determine from the questionnaire answers alone whether their attitudes toward the death penalty were so entrenched as to disqualify them from service. On this record, we must conclude that it is possible that the three could have been rehabilitated by oral voir dire that established their ability to set aside their beliefs and follow the law. Ms. P, for example, not only marked questions 9(A) and 9(B) to indicate she had scruples about the death penalty and could not set them aside, but also marked question 19 to indicate that if she were selected, she would follow the judge's instructions, disregarding her own notions about what the law might be. Given that answer, we cannot say her posi-

tion on question 9 was final and unequivocal. Ms. N answered question 19 in like manner. Ms. W was even more equivocal, saying in answer to question 9(B) that she was only unsure about whether she could set aside her beliefs. She did not say she could not do so, and her answer to question 19 indicated she also would follow the judge's instructions. *Witherspoon* does not allow the trial judge to dismiss prospective jurors for cause merely for expressing objections, which may turn out to be equivocal, to the death penalty. To do so, without further questioning for clarification, would violate the Sixth Amendment and due process if the jury were responsible for sentencing. *See Witherspoon,* 391 U.S. at 521–23, 88 S.Ct. at 1776–77. We have no way of knowing whether the prospective jurors' objections here were general or fixed. It may be that their response to question 9(B)—that their opposition to the death penalty could not be set aside—would be proven incorrect by follow-up questions on voir dire.[2] As *Witherspoon* itself recognizes, this is often the case. *Id.* at 515 n. 7, 88 S.Ct. at 1773 n. 7. A later case teaches that we must assume rehabilitation on the *Witherspoon* question would have been possible when "inadequate questioning" in the voir dire procedure makes it impossible for an appellate court to determine "whether the trial judge erred in removing [the venire persons] for cause." *Gray v. Mississippi,* 481 U.S. 648, 662–63, 107 S.Ct. 2045, 2053, 95 L.Ed.2d 622 (1987).

¶ 11 The *Witherspoon* court took no position on the question of whether a verdict of guilt from a jury so organized must be set aside. 391 U.S. at 517–18, 88 S.Ct. at 1774–75. If *Witherspoon* is applicable to a state like Arizona, in which the judge sentences

2. Two cases on the opposite side of the issue are illustrative. *See State v. Martinez,* 196 Ariz. 451, 999 P.2d 795 (Ariz.Sup.Ct.2000); *State v. Comer,* 165 Ariz. 413, 423–24, 799 P.2d 333, 343–44 (1990) (not abuse of discretion to seat juror who, after extensive questioning, said he could be fair and impartial despite initially stating his opinion that defendant was probably guilty). In *Martinez,* a juror who wrote on a written questionnaire that she had "already made up her mind," that the death penalty is "not used enough," and that she could not be fair and impartial survived a challenge for cause after rehabilitation in the judge's chambers. We held that "[a] juror's preconceived notions or opinions about a case do not necessarily render that juror incompetent to fairly and impartially sit in a case. 'If a juror is willing to put aside his opinions and base his decision solely upon the evidence, he may serve.' The trial court can rehabilitate a challenged juror through follow-up questions to assure the court that he can sit as a fair and impartial juror." 196 Ariz. at 458, 999 P.2d at 802 (quoting *State v. Poland,* 144 Ariz. 388, 398, 698 P.2d 183, 193 (1985) (citations omitted)).

defendants convicted of a capital crime, the trial judge was required to establish, by appropriate voir dire and in compliance with state law procedures, that the venire persons unequivocally expressed an inability to follow the law and the judge's instructions. *Gray,* 481 U.S. at 663, 107 S.Ct. at 2054 (trial judge failed to follow *Witherspoon* voir dire procedure required by Mississippi law when venire persons indicated their opposition to death penalty might make them unable to impose death sentence; thus, court was unable to ascertain that such jurors were *Witherspoon* ineligible and Sixth Amendment guarantee of impartial jury was violated).

¶ 12 Even if *Witherspoon* and its progeny are not binding in Arizona, a judge-sentencing state, the fact is we have adopted them. It would, we think, defy reality to conclude that the jury's determination of guilt or innocence in a first-degree murder prosecution is unaffected after—as in this case—the jurors have learned from the voir dire process itself that death is a potential result of a guilty verdict. Arizona's system implicitly and explicitly acknowledges that jurors' views in opposition to the death penalty could affect their ability to impartially evaluate the defendant's guilt.[3] Otherwise, why in a judge-sentencing state do we voir dire at all on *Witherspoon*'s questions dealing with opposition to the death penalty? The issue is irrelevant unless we acknowledge that jurors' views on the death penalty affect the verdict of guilt or innocence. We so acknowledged, indeed, when we accepted the state's submission and approved death qualification because a juror's views on capital sentencing might "prevent or substantially impair the performance of the juror's duties to decide" the question of guilt or innocence. *State v. LaGrand,* 153 Ariz. 21, 33, 734 P.2d 563, 575 (1987) (quoting *Martinez–Villareal,* 145 Ariz. at 449, 702 P.2d at 678); *see also State v. Van Adams,* 194 Ariz. 408, 984 P.2d 16 (1999)

(rejecting argument that jurors should not be death-qualified because Arizona is judge-sentencing state). There are, of course, two sides to the coin. Just as the State believes death qualification is necessary to a fair trial so that it may remove potential jurors whose opposition to the death penalty would prevent or impair their willingness to convict, we must also acknowledge Defendant's contention that removal of all jurors opposed to the death penalty but willing to set aside their views might produce a jury "organized to return a verdict" of guilt. *Witherspoon,* 391 U.S. at 521, 88 S.Ct. at 1776.

¶ 13 Defendant not only requested oral voir dire to follow up and possibly rehabilitate, but our case law and Rule 18.5 gave him the right to attempt such rehabilitation on *Witherspoon* issues. Rule 18.5(d) reads:

> The court shall conduct a thorough oral examination of prospective jurors. *Upon the request of any party, the court shall permit that party a reasonable time to conduct further oral examination of the prospective jurors.* The court may impose reasonable limitations with respect to questions allowed during a party's examination of the prospective jurors, giving due regard to the purpose of such examination. In addition, the court may terminate or limit voir dire on grounds of abuse. Nothing in this Rule shall preclude the use of written questionnaires to be completed by the prospective jurors, *in addition* to oral examination.[4]

(Emphasis added.)

¶ 14 Defendant argues that the trial judge was required to allow his counsel the opportunity to question the prospective jurors orally and thus ascertain if they could set aside their opposition to the death penalty and render a fair and impartial verdict. Under existing Arizona law, the judge lacks discretion to deny defense counsel's request

---

3. At least one trial judge in Arizona believes it is in the interest of justice to inform prospective jurors on the written questionnaire that their verdict might *not* result in the death penalty. *See State v. Frisinger,* No. 2 CA–CR 97–0618 (Ariz.Ct. App. filed July 29, 1999) (mem. dec.).

4. The dissent believes we would concede that there would have been no error under the former

rule. Believing it sufficient to examine the facts under the rule in effect at the time of trial, we have not addressed or applied the former version of Rule 18.5. Given the importance of death qualification, however, it is obvious that serious problems would have arisen under any rule. Thus, we can make no concession.

under Rule 18.5. *State v. Shone,* 190 Ariz. 113, 115, 945 P.2d 834, 836 (App.1997). The wording of the amended rule requiring a reasonable examination on request of either party is not ambiguous. A reasonable amount of time necessarily includes some amount of time to question on a key issue, subject, as the rule says, to limit or termination to prevent abuse. The clear language and intent of the present rule is that each party be given opportunity and reasonable time to question prospective jurors to discover information relevant to challenges and to possibly rehabilitate them. *Id.*; *see also People v. Wilborn,* 70 Cal.App.4th 339, 82 Cal.Rptr.2d 583 (1999) (trial judge's refusal to voir dire on juror's possible racial bias required reversal); *People v. Lefebre,* 981 P.2d 650 (Colo.App.1998) (same, under procedural rule similar to ours); *Balfour v. State,* 598 So.2d 731 (Miss.1992) (refusal to allow rehabilitative voir dire on *Witherspoon* issue violated both state procedural law and federal constitutional requirements).

¶ 15 The dissent seems to argue that under Rule 18.5 a party has the right to oral voir dire only after the judge has given the "thorough oral voir dire" that the rule requires. Dissent at ¶ 39. If this were so, there is no right to oral voir dire when the judge has violated the rule's requirement that he or she perform a "thorough oral examination" of the panel. Even if we agreed with this strained reading of the rule, the result is not changed. The rule is violated when the judge fails to comply with the requirement that he or she conduct the oral voir dire examination. Rule 18.5 cannot rationally be read to permit the trial judge to use written questionnaires in order to dispense with the thorough oral voir dire the rule requires the judge to make and to allow counsel. Such an interpretation would permit the judge to completely abrogate oral voir dire examination, thus violating the text and intent of Rule 18.5.

¶ 16 The State argues that there were other valid reasons for the trial judge to discharge the three persons in question. Review of the transcripts, however, indicates that the other grounds mentioned were makeweights, if anything, rather than motives for discharge. Their answers to other portions of the questionnaire disclose no reason for granting a challenge for cause without allowing the requested voir dire for rehabilitation purposes. As to Ms. W, for instance, the judge mentioned the fact that the very graphic nature of potential evidence might upset her, that she was not sure she understood the rules regarding proof beyond a reasonable doubt, and thus she might not be able to render a verdict solely on the evidence presented at trial. Reporter's Transcript, Jan. 12, 1998, at 30. None of these answers is so exceptional as to present so clear a need for dismissal for cause as to excuse violation of Rule 18.5. The reasons given for Ms. N's discharge were even less compelling. She responded that she was unsure how she would react to graphic evidence because it might sway her to a guilty verdict. Most important, she stated that "because of my Christian beliefs, I'm not in a position to judge someone guilty for a possible death sentence. *He* is the only one who can judge that." The latter statement was what prompted the judge's action. *Id.* at 37. Nevertheless, Ms. N indicated in answer to question 19 that if selected as a juror, she would follow the judge's instructions and disregard her own notions. We do not believe the fact that a prospective juror holds strong Christian or other religious beliefs that might affect her view of the evidence is grounds for a challenge for cause without allowing voir dire to determine whether she can follow the law and the judge's instructions. Finally, Ms. P was discharged for even less reason. The only problem the judge mentioned in addition to her answers to questions 9(A) and 9(B) was the fact she had indicated she was unsure about being fair if she was shown graphic evidence. *Id.* at 29. Each of these rulings was made over objection and a request for oral voir dire. These rulings all violated Rule 18.5. They also violated the death qualification procedure our court has adopted.

¶ 17 We come, then, to the question of whether reversal is required when a violation of Rule 18.5(d) results in discharge of a potential juror or jurors who may or may not have been impartial. Whatever the answer

in an ordinary case, and even though the Supreme Court has not made *Witherspoon* applicable to judge-sentencing states, we must keep in mind not only the fact that our case law has accepted the principles recognized by *Witherspoon,* but also the underlying importance to the system of justice of the questions at issue here. Several cases from other states are analogous and instructive. Florida's voir dire rule is similar to ours in giving counsel a right of oral voir dire. *See* Fla.R.Crim.P. 3.300(b). On the basis of that rule, the Florida Supreme Court reversed a capital *conviction* because the trial judge erred in refusing to afford defense counsel an opportunity to rehabilitate two venire persons who had indicated their opposition to the death penalty. *O'Connell v. State,* 480 So.2d 1284, 1286 (Fla.1985). In a later case presenting the same situation, the court affirmed the conviction but vacated the death penalty, reducing the sentence to life imprisonment. *Hernandez v. State,* 621 So.2d 1353 (Fla.1993). One year later, the court again reduced a sentence to life because of a similar violation of the voir dire rule. *Willacy v. State,* 640 So.2d 1079 (Fla.1994). The *Willacy* court distinguished *O'Connell,* pointing out that the conviction in that case was implicated because the trial judge deprived the defendant of due process by denying him the right to rehabilitate prospective jurors who opposed the death penalty while allowing the state to rehabilitate those who favored it. *Id.* at 1081. The present case is much like *O'Connell* because, despite being a judge-sentencing state, Arizona has given the state the right to raise and voir dire on *Witherspoon* issues. *See Van Adams,* 194 Ariz. at 417, 984 P.2d at 25, and *ante* ¶ 13.

¶ 18 Mississippi, a jury-sentencing state, has reached similar conclusions. Mississippi law gives the parties in all jury trials the right to question prospective jurors on voir dire. *See* Miss.Code Ann. § 13–569 (1972) (now contained in Rule 5.02, Mississippi Uniform Criminal Rules for Circuit Court Procedure). In what they call "*Witherspoon* with a twist," the Mississippi cases hold it is reversible error to refuse counsel an opportunity to rehabilitate on *Witherspoon* issues. *See, e.g., Fuselier v. State,* 468 So.2d 45, 54–55 (Miss.1985); *cf. Hansen v. State,* 592 So.2d 114, 127 (Miss.1991) (error to refuse rehabilitation on *Witherspoon* issues, but error was harmless because answers to judge's question were not equivocal); *Balfour,* 598 So.2d at 754–55 (also found error, but failed to reach harmless error issue).

¶ 19 Defendant was entitled by our rule to voir dire examination of potential jurors. In light of our practice of death qualification on the question of guilt or innocence, Defendant was entitled to attempt to rehabilitate those venire persons who expressed opposition to the death penalty and to "save them" for the trial jury, thus possibly having the question of his guilt or innocence determined by a jury composed of both opponents of and adherents to the death penalty. Death qualification is a two-edged sword. While we need not and do not reach any conclusion with respect to whether the failure to allow oral voir dire and possible rehabilitation created a federal constitutional violation, we certainly must conclude that it was a violation of our procedural rules on an issue of vital importance and fundamental fairness.

¶ 20 Error in jury selection on *Witherspoon* and similar issues is considered structural; "[t]he remedy for a juror wrongfully excluded is potent." *Balfour,* 598 So.2d at 755 (refusal to allow rehabilitative questions on *Witherspoon* issue; also reversed on other grounds). Harmless error analysis is inapplicable to the erroneous grant of challenges for cause on *Witherspoon*-type issues. *See Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976). In a later case, the Court described the facts and reaffirmed *Davis* in the following terms:

> In order to avoid errors based on this type of failure to establish an adequate foundation for juror exclusion, Mississippi law ... requires the trial judge himself to question the venire members. The trial judge in this case, however, did not comply with the Mississippi procedure. Had he done so, despite their initial responses, the venire members might have clarified their positions upon further questioning and revealed that their concerns about the death penalty were weaker than they originally stated. It might have become clear that

they could set aside their scruples and serve as jurors. The inadequate questioning regarding the venire members' views in effect precludes an appellate court from determining whether the trial judge erred in refusing to remove them for cause.

\* \* \*

We reaffirm [*Davis*] today in a case that brings into focus one of the real-world factors that render[s] inappropriate the application of the harmless-error analysis to such erroneous exclusions for cause. Unlike *Davis* in which the state court found that the erroneous exclusion of the scrupled, yet eligible, venire member was an isolated incident because the record revealed that similar jurors were not excused, the record in the instant case does not support such a finding. In fact, it suggests the opposite—that the State exercised its peremptory challenges to remove all venire members who expressed any degree of hesitation against the death penalty. Because courts do not generally review the prosecution's reasons for exercising peremptory challenges, and because it appears that prosecutors often use peremptory challenges in this manner, a court cannot say with confidence that an erroneous exclusion for cause of a scrupled, yet eligible, venire member is an isolated incident in that particular case. Therefore, we cannot say that courts may treat such an error as an isolated incident having no prejudicial effect.

\* \* \*

As was stated in *Witherspoon,* a capital defendant's constitutional right not to be sentenced by a "tribunal organized to return a verdict of death" surely equates with a criminal defendant's right not to have his *culpability* determined by a "tribunal 'organized to convict.'"
*Gray,* 481 U.S. at 662–63, 667–68, 107 S.Ct. at 2053–54, 2056, 2057 (citations and footnotes omitted, emphasis added).

¶ 21 Arizona has recognized that errors in jury composition are not "amenable to quantitative assessment. Error is harmless [only] when we can say it did not affect the verdict." *State v. Smith,* 305 Ariz. Adv. Rep. 3, 6, 197 Ariz. 333, 339–340, 4 P.3d 388, 394–395 (App.1999) (defendant tried to eight-person rather than twelve-person jury to which he was entitled; not possible to predict what properly composed jury might have done). Our cases have long followed this position. *See State v. Henley,* 141 Ariz. 465, 469, 687 P.2d 1220, 1224 (1984); *State v. Luque,* 171 Ariz. 198, 200, 829 P.2d 1244, 1246 (App. 1992).

¶ 22 In light of what the State describes as overwhelming evidence against Defendant, it is tempting to conclude that even under the circumstances of this case, the violation of Rule 18.5 was harmless error, for surely any jury hearing Defendant's confessions and the other evidence would have found him guilty. But this argument leads us down a slippery slope that could be used to justify overlooking every structural error, from the size and composition of the jury to the denial of a jury trial or the right to counsel. It could justify the assignment of a biased judge, impaneling a jury from which minorities were excluded or one containing persons biased against the defendant's race; it could also be used to justify denial of the right of self-representation or the right to public trial. *See Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). Review of such errors is not like measuring the effect of erroneous evidentiary rulings against the overall weight of properly admitted evidence. Errors involving the composition of the court or jury affect the legitimacy of the entire proceeding, leaving nothing to measure or weigh and requiring reversal. Chief Justice Rehnquist put it another way in *Fulminante:* Errors that occur "during the presentation of the case to the jury" are susceptible to a harmless error analysis because they may "be quantitatively assessed in the context of [the] other evidence." *Id.* at 307–08, 111 S.Ct. at 1264. But errors that create "defects . . . in the trial mechanism" itself affect the "entire conduct of the trial from beginning to end," damage "the framework within which the trial proceeds," and are therefore not subject

to harmless error analysis. *Id.* at 309–10, 111 S.Ct. at 1265.

¶ 23 Thus, excluding for cause prospective jurors who may have had only general objections to the death penalty and denying oral voir dire that might rehabilitate, in violation of the Arizona Rules of Criminal Procedure, constitute structural error.[5] Therefore, we do not believe the trial judge's violation of the first sentence of Rule 18.5 by discharging the three for cause, without conducting the "thorough oral examination" required by Rule 18.5, excuses his denial of the right given to counsel under the rule's second sentence "to conduct a further oral examination...."

■■■ ¶ 24 The trial court's judgment must therefore be reversed and the case remanded for a new trial. We reach this result based on our practice of permitting death qualification even though Arizona is a judge-sentencing state and because of Rule 18.5. We do not conclude that violations of Rule 18.5 are fundamental error or that all violations would amount to structural error. If, for example, the judge had refused counsel's request for additional voir dire but had asked the appropriate questions himself, we would have a different case. We would also have a different case if the record did not indicate a denial of the right to question on a significant issue. Likewise, notwithstanding the dissent's protestations, our holding today does not prevent excluding prospective ju-

rors for cause based solely on answers to a written questionnaire when the adverse party fails to object, or when all parties consent to exclusion. *See State v. Jones,* 197 Ariz. 290, 303, 4 P.3d 345, 358 (2000). Nor is it error to exclude prospective jurors for cause when the answers to the written questionnaire reveal some disqualification not susceptible to rehabilitation, such as relationship to case or party.[6]

## B. Sufficiency of the evidence to support the armed robbery verdict

■■■ ¶ 25 Defendant argues that there was insufficient evidence to support an armed robbery conviction because the evidence produced at trial failed to show he had the requisite intent before or during the murders. He argues that the idea of taking Wear's truck and Leta's purse and property could have been formulated after the murders. Therefore, the use of force on Leta and Wear was independent of the subsequent robbery.

¶ 26 Several matters provide circumstantial evidence of Defendant's intent before and at the time of the murders. A jury could reasonably conclude that Defendant was motivated to kill because he wanted Wear's truck. Immediately after killing Wear with Defendant's help, Poyson searched Wear's pockets for the keys to the truck. Defendant

---

**5.** As noted *ante* at ¶ 10, the *Witherspoon* rule is not absolutist. The Court later explained that trial judges have discretion, after seeing and hearing the prospective juror answer *Witherspoon* questioning, to decide whether his opposition to the death penalty would "prevent or substantially impair performance of his duties." *Witt,* 469 U.S. at 424, 105 S.Ct. at 852. In the present case, however, *Witt* cannot be applied. The three prospective jurors were discharged without having been questioned to clear up the uncertainties arising from their responses to the questionnaire. Unlike the venire person in *Witt,* the prospective jurors in this case were not seen or heard; their answers were not evaluated by the judge. There was no exercise of discretion and nothing to which we might defer. This is also why we disagree with the dissent's position that the judge could have believed the prospective jurors' answers on the written questionnaire when they checked the box denoting they could not set aside their beliefs regarding the death

penalty. *See* dissent at ¶ 44. Without seeing or hearing them, there is no reason why the judge would give more weight to this check mark than to the one indicating they would be able to follow the instructions of the judge and disregard their own notions of what the law is or ought to be.

**6.** Today's opinion has only a minimal effect on use of written questionnaires, contrary to the concerns of the dissent. *See* dissent at ¶ 43. Of the 81 persons who answered the written questionnaire in the present case, 19 were properly excluded based on the agreement of the attorneys and the judge. Reporter's Transcript, Jan. 12, 1998, at 39. Information to assist, and thus shorten, the oral voir dire process was obtained on all the remaining panel members. *See also Jones,* 197 Ariz. at 303, 4 P.3d at 358 (dismissal of 30 jurors based solely on answers to written questionnaire upheld when both prosecution and defense agreed to exclusion).

also said one of his motives for the killings was the desire to leave the isolated location and continue his travels:

> Cooper [officer]: What did Bobby [Poyson] [say] when he heard you guys were thinking about leaving?
>
> Defendant: That, uh, he come up and he says, hold on and says, well, I think I can help you get outta here, you know. I said, what do you mean. He says I just think I can help you get outta here.
>
> Cooper: I don't understand why you would need help gettin' outta there, you can just walk away.
>
> Defendant: Seventeen mile to town.

State's Exhibit 3, at 20–21.

¶ 27 In a similar case, the lack of money or means of escape was found to provide sufficient circumstantial evidence to support an armed robbery conviction. *See State v. Comer,* 165 Ariz. 413, 799 P.2d 333 (1990). In *Comer,* the defendant arrived at a campground low on gas and without money. He invited the victim to his campsite, killed him, went through his pockets, and within ten minutes went to the victim's campsite to steal his money and goods. His financial condition was deemed sufficient to infer that his motive for killing the victim was robbery. *See also State v. Henry,* 176 Ariz. 569, 576–77, 863 P.2d 861, 868–69 (1993) (evidence of unlikelihood of scenario proffered by defendant, coupled with finding victim's wallet near the murder scene and evidence that defendant drove the victim's truck away immediately after the murder, supports robbery charge).

¶ 28 Here, the facts are even more compelling. Defendant, Poyson, and Lane had no money or means of escape. Defendant admitted facts establishing that the murders were premeditated, and taking Wear's truck was the object to be gained. The dialogue quoted above shows that Defendant knew he could not walk away, and no evidence was produced at trial to indicate he had some alternate escape plan. Defendant was arrested in Wear's truck and confessed that he had sold Leta's property to buy food and gas. No motive other than robbery was presented to explain the killings. While a jury could conclude that the idea of taking the truck and other property arose only after and apart from the killings, it could also reach the opposite conclusion. Defendant cites *State v. Lopez* in support of his proposition that insufficient evidence was presented in this case. 158 Ariz. 258, 762 P.2d 545 (1988). But in *Lopez,* no evidence was introduced suggesting that the victim was murdered with the prior intent to take his property. The trial judge found that the victim's car and wallet were taken to aid in escape after the killing, to prevent or delay identification, and to destroy evidence. *Id.* at 264, 762 P.2d at 551. These purposes were formulated only in contemplation of the repercussions of the murder. In the case at hand, the evidence is sufficient to show that Defendant committed the murders for the express purpose of taking Wear's truck, not as an afterthought. Defendant's own statements show that one of the motives for the murders was to leave Golden Valley. From the evidence presented at trial, a reasonable juror could certainly conclude that Defendant and Poyson planned to steal the truck and some money before the murders were committed. Therefore, sufficient evidence exists to permit retrial on the armed robbery charge.

## C. Duplicitous indictments

¶ 29 Defendant contends that the conspiracy to commit murder and armed robbery indictments issued by the grand jury lacked sufficient specificity, causing the indictments to be duplicitous. He argues that because the indictments name neither the victims of the alleged armed robbery, the specific valuables alleged to have been stolen, nor the persons alleged to be the objects of the conspiracy, he may have been convicted by a less than unanimous jury verdict. In light of our disposition of this case, we need address this difficult issue only to point out that the case can be remanded for a new indictment or the indictment may be amended prior to Defendant's new trial to avoid any confusion as to the charges that Defendant must meet.

## D. Unduly gruesome photographs

¶ 30 Defendant made timely objections to the introduction of fourteen gruesome photographs as being unduly prejudicial. *See State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208

(1983). Upon review of the photographs, we agree that several of them are cumulative of other photographs and that in several instances less gruesome photographs provide identical information. Some are arguably overly prejudicial in light of their slight probative value. All relevant facts were admitted by Defendant and amply corroborated by forensic experts. These photographs add very little to the presentation of the case, and the *extremely* gruesome nature of some militates against admission. We assume that the prosecutor and trial judge will utilize suitable discretion to ensure that unnecessary and otherwise overly prejudicial photographs are not introduced on retrial.

### E. Admission of Defendant's statements to police

¶ 31 Defendant makes two arguments questioning the admissibility of his taped confessions. First, he asserts that he was not brought before a magistrate within twenty-four hours of arrest, as required by Arizona law, thereby denying him his right to consult with counsel. Second, Defendant claims that because he was sleep deprived, one of his statements was involuntary.

¶ 32 Confessions are presumed to be involuntary, and the State has the burden of proving by a preponderance of the evidence that the confession was voluntary. *See State v. Amaya–Ruiz,* 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990). Absent clear and manifest error, the trial judge's ruling will not be disturbed on appeal. *See State v. Rivera,* 152 Ariz. 507, 513, 733 P.2d 1090, 1096 (1987).

¶ 33 Upon arrest in Illinois on August 18, 1996, Defendant was given his *Miranda* rights, taken to the local police station, and processed. This included a four and one-half hour interview with Investigator Steven Shields. The interview began at about 9:00 p.m. and concluded at 1:30 a.m. This interrogation is not challenged. The following day, Defendant was interviewed by Investigator Shields and Detective Cooper of the Mohave County Sheriff's Office from 11:00 p.m. until "a few hours into the morning." The timing of the interview was due to Cooper's late arrival from Arizona. Upon arrival in Ari-

zona on September 2, 1996, Defendant was interviewed a third time, after which he was brought before a magistrate, fourteen days after his arrest. A motion to suppress the second and third interviews for failure to provide an attorney in a timely manner was filed on February 18, 1997. A suppression hearing was held to determine the voluntariness of Defendant's statements. The trial judge found no coercion by the interviewers and concluded that Defendant made a voluntary, knowing, and intelligent waiver of his right to counsel.

¶ 34 The purpose of the initial appearance is to advise the defendant of the charges against him and to inform him of his right to counsel and to remain silent. *See State v. Van Dyke,* 127 Ariz. 335, 621 P.2d 22 (1980). Defendant claims that by failing to bring him before a magistrate within the twenty-four hour period provided by Arizona law, or some other amount of time less than fourteen days, he was deprived of his right to counsel. Defendant's argument fails because the Arizona Rules of Criminal Procedure do not apply to Illinois, and there is no claim that the Illinois rules were violated. Defendant was brought before an Arizona magistrate within 24 hours of entering Arizona, thus complying with Arizona law. Defendant was read his *Miranda* rights before making any statements and several times during the course of his interviews. He also signed an explicit waiver of his right to counsel. Therefore, Defendant was not denied his right to counsel due to the failure to bring him before a magistrate within twenty-four hours of his arrest in Illinois.

¶ 35 Defendant also challenges the second interview on the basis that he was sleep deprived at the time of the interview. Twenty-one hours elapsed between the first and second interviews. Defendant provided no evidence that he was prevented from sleeping during this time period or that he informed the officers he was too tired to continue with the interview. Furthermore, he was provided food and drink as well as cigarette and bathroom breaks during the interview. *See State v. Scott,* 177 Ariz. 131, 865 P.2d 792 (1993) (failure to ask for food,

medication or sleep, coupled with a lack of evidence that any request would not be granted, satisfies the State's burden to establish the voluntariness of a confession). There being no evidence indicating a lack of sleep, a request for more sleep, or that the police withheld sleep or other necessities to elicit a confession, we conclude that the State has met its burden of establishing the prima facie voluntariness of Defendant's statements.

## CONCLUSION

¶ 36 Finding structural error in the jury selection process, the conviction is hereby reversed. The case is remanded for retrial in accordance with this opinion.

CONCURRING: THOMAS A. ZLAKET, Chief Justice, CHARLES E. JONES, Vice Chief Justice, RUTH V. McGREGOR, Justice.

MARTONE, Justice, dissenting.

### I.

¶ 37 Before 1995, Rule 18.5(d), Ariz. R.Crim. P., provided:

The court shall conduct the *voir dire* examination, putting to the jurors all appropriate questions requested by counsel. The court may in its discretion examine one or more jurors apart from the other jurors.

If good cause appears, the court may permit counsel to examine an individual juror.

¶ 38 It was thus plain that under our former rule, the trial judge conducted *voir dire* in criminal cases and could, but need not, allow counsel to participate. Thus, had this case been tried under the former rule, even the majority would concede that there was no error.

¶ 39 In 1995, we amended Rule 18.5 in order to harmonize it with civil practice. We gave the parties a limited right to engage in oral *voir dire*. The rule begins by stating that "[t]he court shall conduct a thorough oral examination of prospective jurors." This is consistent with the criminal practice under former Rule 18.5 in that the judge, not

counsel, is the laboring oar in *voir dire*. In order to harmonize the civil rule with the criminal, we simultaneously amended Rule 47(b)(2), Ariz. R. Civ. P., by deleting the word "preliminary," and replacing it with the word "thorough."

¶ 40 The next sentence of Rule 18.5(d), as amended in 1995, states that "[u]pon the request of any party, the court shall permit that party a reasonable time to conduct a *further* oral examination of the prospective jurors." (emphasis added). This changed Arizona criminal practice and gave, for the first time, a party a right to engage in oral *voir dire*. But it limited that right to "a further oral examination." Well, "further" in connection with what? From the text, it is plain that it is "further" than the trial court's "thorough oral examination" in the immediately preceding sentence. As stated in the report of the State Bar, "[u]nder such proposal lawyers, both civil and criminal, will be allowed to supplement the court's *voir dire* on whatever non-duplicative matters are left. With an adequate *voir dire* by the trial judge, lawyers should not have too much left to cover." State Bar Civil Practice and Procedure Committee, *Report to the Arizona State Board of Governors RE Petitions R–94–0031 and R–92–0004 Jury Reform Proposals*, at 9 (Apr. 7, 1995).

¶ 41 Thus, a party's right to further oral examination of the prospective jurors is limited to the class of prospective jurors that has already been the subject of the court's thorough oral examination. It does not extend to those prospective jurors to whom a written questionnaire was given unless those jurors are orally examined by the judge. This reading is confirmed by the last sentence in Rule 18.5(d) which states "[n]othing in this Rule shall preclude the use of written questionnaires to be completed by the prospective jurors, in addition to oral examination." This was intended to leave in place then existing written questionnaire practices, unaffected by the new right to party oral *voir dire*.

¶ 42 Judges use written questionnaires to prescreen jurors in cases in which there might be problems, for example, cases in which there is massive pretrial publicity or cases that are likely to take an extended

period of time to try. The judge can give such a questionnaire to the jury commissioner who in turn will give the questionnaire to hundreds of prospective jurors. Thereafter, the judge can review the questionnaires with counsel and exclude persons based upon the answers. The judge can then call to the courtroom only those jurors who do not have identifiable problems. It is that panel that will be subject to the judge's thorough oral examination and it is that panel that the party has a right to further oral examination. The benefit of this procedure is that court and counsel will orally *voir dire,* say, 50 jurors rather than 200.

¶ 43 In contrast, the majority says that our case law and Rule 18.5 give a party the right to rehabilitate prospective jurors whose answers on the written questionnaires are problematic. *Ante,* at ¶ 14. Our case law says no such thing. We have no cases on the subject and the only case cited by the majority is a court of appeals opinion that simply does not address the question of a written questionnaire. Nor is there anything in Rule 18.5 that gives a party a right to attempt to rehabilitate answers on a written questionnaire. The rule only gives a party the right to orally examine jurors that the judge has already orally examined. And obviously the trial judge need not orally examine all the persons to whom the written questionnaire is given, or else the written questionnaire can never be used as a prescreening device.[1]

¶ 44 The extension of Rule 18.5 to give a party an absolute right to orally examine every prospective juror to whom a written questionnaire has been given, will, I believe, discourage trial judges from using written questionnaires at all. If they cannot be used to reduce the size of a panel to a manageable level without the complexity of party oral *voir dire,* why (from a judicial perspective) use them at all?

II.

¶ 45 Even if one could assume that our 1995 amendment to Rule 18.5 intended today's result, I do not believe that denying a party an opportunity to rehabilitate a prospective juror could ever be structural error, *unless it was error for the trial judge to have excluded the juror in the first place.* But the assumption underlying today's decision is that the affected jurors' answers to question 9(B) of the written questionnaire, if final, were such that their excusal "did not violate the rule of *Witherspoon* and *Morgan.*" *Ante,* at ¶ 8. The trial judge could believe the jurors when they said that they could not set aside their views on the death penalty, impartially weigh the evidence in the case, and return a verdict in accordance with the law. *Id.* The judge may, but need not, attempt to rehabilitate prospective jurors. Thus it was not error for the trial judge to exclude these jurors based upon their answers. It, therefore, cannot be structural error for these jurors to have been excluded.

¶ 46 Nor is there any suggestion that this defendant was tried by anything but a fair and impartial jury. We thus have an anomalous result in which a peculiar reading of an amended rule of criminal procedure results in structural error in a case in which the trial judge did not err in excluding the jurors.

¶ 47 I therefore respectfully dissent.

[redacted]

1. Thus, the judge does not, as the majority claims, *ante,* at ¶¶ 15, 23, violate Rule 18.5 when he chooses not to orally examine all the prospective jurors to whom a written questionnaire is given.